SHELLABARGER GRAIN PRODUCTS CO.
v. COMMISSIONER OF INTERNAL
REVENUE.

COMMISSIONER OF INTERNAL REVE-
NUE v. SHELLABARGER GRAIN
PRODUCTS CO.

Nos. 8478, 8536.

Circuit Court of Appeals, Seventh Circuit.

Dec. 2, 1944.

Robert P. Vail, of Decatur, Ill., for Shellabarger Grain Products Co.

Samuel O. Clark, Jr., Sewall Key, A. F. Prescott, Harry Baum, and Morton K. Rothschild, Asst. Attys. Gen., and J. P. Wenchel, and Bernard D. Daniels, Bureau of Internal Revenue, both of Washington, D. C., for the Commissioner.

Before SPARKS, MAJOR, and MINTON, Circuit Judges.

MAJOR, Circuit Judge.

These are petitions to review a decision of the Tax Court of the United States concerning income and excess profits tax liability of Shellabarger Grain Products Company, a corporation, for the fiscal year ending September 30, 1938. In No. 8478, the corporation (taxpayer) complains of that portion of the decision which is unfavorable to it, and in No. 8536, the Commissioner of Internal Revenue complains of that portion of the decision which is unfavorable to him. The facts in the case were all stipulated. The questions for decision are largely, if not entirely, ones of law. We shall first state the contested issues in No. 8478, the facts relevant thereto, and make our decision. We shall then proceed likewise in No. 8536.

In No. 8478, the primary question is whether petitioner was entitled to a dividends paid credit, under Sec. 27 Par. (a) [1] of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 837, on account of a disbursement made to its stockholders on August 11, 1938. The solution of this question is dependent upon whether the distribution was in partial liquidation within the meaning of 115(i), 26 U.S.C.A. Int. Rev. Acts, page 871, and, if so, whether the issue is to be determined by 27(f) in connection with 115(c), or by 27(f) in connection with 115(a) and (b).

---

[1] Hereafter, the words Sec. and Par. or Subsec. will be omitted. Numerals will refer to sections and letters to paragraphs or subsections. All references will be to the Revenue Act of 1936, except as otherwise noted.

Petitioner, an Illinois corporation organized in 1929, reported its income on the accrual basis, with the fiscal year ending on September 30. In accordance with this practice, it filed its income and excess profits tax return for the fiscal year ending September 30, 1938. The business of petitioner was the purchase, sale and manufacture of soy beans and soy bean products. Prior to 1938, petitioner had reduced its outstanding capital stock to 1,810 shares of common stock of a stated value of $50 per share, or a total of $90,500. At the commencement of the latter year, it had a paid-in surplus of $63,500, created by the reduction of its capital stock. At that time, it had no accumulated earnings or profits but had a deficit of $53,203.27 from operations in prior years. During the fiscal year 1938 and prior to the date of the distribution in controversy, petitioner's outstanding capital stock was increased by $6,000, representing the proceeds received from 120 shares purchased by petitioner's president at $50 per share. Prior to 1938, petitioner never declared or paid any dividends.

On July 15, 1938, petitioner entered into a written contract with Spencer Kellogg & Sons, Inc., of Buffalo, New York, providing for the sale of all of petitioner's assets for an agreed purchase price of $250,000, subject to adjustment for business done by petitioner from June 1, 1938 to date of consummation of the contract. Upon consummation, the contract required in substance that petitioner cease the conduct of all business activities in which it was then engaged; that it be promptly dissolved and liquidated; that petitioner not disclose to any person, firm or corporation other than the buyer any information or secrets in connection with its business to be transferred; and that the purchaser have the exclusive peaceful enjoyment of such business.

On the same date that the contract just referred to was executed, a meeting was had of petitioner's directors. They were told, in substance, that if the contract was consummated petitioner would be required to cease doing business, to liquidate its affairs and dissolve. It was thereupon unanimously resolved that upon consummation of the contract, the corporation be dissolved, that the question of such dissolution be submitted to a vote of its shareholders at a meeting called for such purpose, and that a notice thereof be given the stockholders, or that waivers and consent be obtained for the holding of such meeting.

In response to such notice, petitioner's shareholders met on August 5, 1938. At such meeting, petitioner's president explained the contract of sale, called attention to the resolution of its board of directors at their meeting on July 5, 1938, and recommended that the company be dissolved. He expressed the opinion that the contract of sale would be consummated, suggested the passage of a resolution of voluntary dissolution, explaining that it could be rescinded in case the sale was not consummated. Thereupon, by the affirmative vote of all shareholders, it was resolved that the petitioner dissolve voluntarily. Upon the suggestion of the president, this meeting was held open until August 10, 1938, so that action might be taken upon any questions which might arise in connection with the contract for sale and so that the resolution to dissolve might be rescinded if the contract should for any reason fail of consummation. The meeting was then adjourned until August 10, 1938, as suggested.

The contract was consummated on August 10, 1938, for an aggregate consideration of $262,464.74, resulting in a gain thereon to petitioner of $45,362.38. On the same date, August 10, 1938, petitioner's directors held a meeting, at which a resolution was adopted authorizing the proper officials of petitioner to include in the transfer of property to Spencer Kellogg & Sons certain life insurance policies on the life of petitioner's president, the same being a part of petitioner's assets contracted to be sold. At this meeting, the president stated to the directors that it would be well to distribute as dividends an amount equal to the entire estimated earnings and profits of the company for the current fiscal year in order that petitioner be under no liability for undistributed profits tax. It was then resolved "that a dividend of $35 a share be and the same is hereby declared upon the outstanding capital shares of the Company, payable immediately to shareholders of record at this date." Pursuant to this resolution, the petitioner on August 11, 1938 distributed to its shareholders the sum of $67,550.00. (This is the distribution for which petitioner claims a dividends paid credit under 27.)

On September 3, 1938, and in accordance with one of the modes for the dissolution of corporations, provided by the Illinois statutes, the shareholders of petitioner unanimously executed a formal agreement that petitioner dissolve voluntarily and wind up its affairs. This agreement to dissolve was incorporated in a statement of intent to dissolve by voluntary consent of the shareholders, which was filed with the Secretary of State of Illinois on September 7, 1938, and refiled with the Recorder of Deeds of the appropriate county on September 8, 1938, pursuant to statute.

On October 3, 1938, petitioner's directors adopted a resolution providing that a liquidating dividend and distribution of $35 a share be paid immediately to petitioner's shareholders and that the balance of petitioner's funds be retained as a reserve to meet the remaining liabilities until the same could be ascertained and paid. Pursuant to that resolution, petitioner on the same date distributed $67,550 to its shareholders. (This distribution is not involved in the instant litigation.)

Within less than one year after the consummation of the sale of petitioner's assets (August 10, 1938), all of petitioner's liabilities had been determined except (1) its undetermined liability with the Millikin National Bank, involved in state court litigation (the basis for an issue raised by the Commissioner and hereinafter discussed), (2) petitioner's liability for income taxes involved in this proceeding, and (3) expenses in connection with its final certificate of dissolution not yet filed.

Petitioner has conducted no business except the liquidation and winding up of its affairs since July 10, 1938. None of its certificates for outstanding shares of stock have been cancelled or returned to petitioner, but remain in the hands of its shareholders.

In its income and excess profits tax return for its fiscal year 1938, petitioner reported a net income of $56,259.57. (This included the gain of $45,362.28 realized on the sale of assets as heretofore shown.) In said return, petitioner took a dividends paid credit of $67,550 on account of the distribution made on August 11, 1938. Respondent in his determination of the deficiency involved herein made certain adjustments in net income (not now material), and disallowed the dividends paid credit of $67,550, on the ground that the distribution was in partial liquidation and properly chargeable in its entirety to petitioner's capital account, and not a distribution of earnings or profits under 27(f) and 115(c).

At this point, it is interesting and perhaps pertinent to note that petitioner's president on March 3, 1939 notified petitioner's shareholders by letter that of the $35 distribution made to them on August 11, 1938, $24.06 was taxable as a dividend and should be so included in their income tax returns, and that the balance of the distribution and all subsequent distributions were in the nature of liquidating dividends and should not be included as income on the shareholders' returns. They were also advised that they would be promptly notified if, upon audit of petitioner's return for 1938 by the revenue authorities, there should be a change in such calculations. The shareholders, pursuant to this suggestion by petitioner's president, included in their return for the calendar year 1938, $24.06 per share of the distribution of August 11, 1938. Since the disallowance of the dividends paid credit taken by petitioner, the shareholders have filed claims for refund of the tax paid on the portion of the distribution of August 11, 1938 reported as taxable income. These claims remain undisposed of by respondent.

The Tax Court decided (1) that the distribution of August 11, 1938 was one in partial liquidation within the meaning of 115(c) and (i) and 27 (f); (2) that to the extent necessary to absorb the deficit existing at the beginning of the taxable year, the current earnings were properly chargeable to capital account under 115(c), and that only the excess represented "earnings or profits accumulated after February 28, 1913," within the meaning of 27(f); and (3) that in determining under 27(f) "the part" of the distribution which was properly chargeable to accumulated earnings, the amount distributed was to be allocated between capital and accumulated earnings in the ratio that each bore to the total of capital and accumulated earnings available for distribution. At this point, we observe that 26(c) (3) and (f) of the Revenue Act of 1936 were added by Sec. 501 of the Revenue Act of 1942, 26 U.S.C.A. Int.Rev.Acts, to be effective as of January 1, 1936. These additions to the Act of 1936 were made subsequent to the hearing of the instant case by the Tax

Court, but prior to decision. The Tax Court held such additions without application to the instant controversy.

 Did the Tax Court properly decide that the distribution in question was one in partial liquidation? The definition of partial liquidation is contained in 115(i). It provides in part:

"As used in this section the term 'amounts distributed in partial liquidation' means a distribution by a corporation * * *, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock."

We have already stated in some detail the facts and circumstances existing at the time the distribution in question was made, and we shall not repeat. At that time, the contract for sale of all of petitioner's assets had been consummated and converted into cash, and its dissolution authorized and directed by its corporate officers. That it was then in the process of dissolution is borne out by the fact that on September 7, 1938, a statement of intent to dissolve, agreed to by all the stockholders, was filed with the Secretary of State, and since the date of the distribution petitioner has conducted no business except the liquidation of its debts and the winding up of its affairs. Moreover, it was under contract with Spencer Kellogg & Sons not only to cease business but to dissolve and liquidate.

We are not impressed with petitioner's argument that a contrary holding is required because the distribution was designated a dividend or because the minutes of a corporate meeting recited that the distribution was made at the suggestion of petitioner's president in order to be relieved of liability for undistributed profits tax. Whatever might have been its purpose, the fact remains that the corporation was going out of business; in fact, it was already out and in the process of dissolution as a result of its own contractual obligation. We think the distribution in question plainly comes within the statutory definition of one in partial liquidation. As was said in Holmby Corp. v. Commissioner, 9 Cir., 83 F.2d 548, 549:

"The determining element is whether the distributions were in the ordinary course of business and with intent to maintain the corporation as a going concern, or after deciding to quit and with intent to liquidate the business."

Petitioner further contends that even though the distribution be considered as one in liquidation, its composition must be determined by 115(a) and (b) rather than by 115(c), as held by the Tax Court. In this connection, we note petitioner's argument that the Tax Court was in error in holding that current earnings must first be used to absorb the corporate deficit and, therefore, charged to capital account, and that only the excess, if any, of such earnings or profits was available for distribution. We need not discuss the numerous cases relied upon by respondent in support of the general rule that a corporate deficit must be absorbed before there are any earnings or profits for distribution. Cf. Van Norman Company v. Welch, 1 Cir., 141 F.2d 99, 101, 102, and cases therein cited. This is unnecessary for the reason that petitioner takes no issue with this general rule but argues that 115(a) and (b) in their present form preclude its applicability. On the other hand, the Tax Court in applying the rule held 115(a) and (b) inapplicable in the instant situation. Therefore, not only is the character of the distribution in question dependent upon whether (a) and (b) or (c) is applicable, but also whether the earnings must be used to absorb the deficit.

This brings us to a consideration of the provisions of the Revenue Act of 1936, as they relate to the instant question. 27 is entitled "Corporation Credit for Dividends Paid." It provides:

"(a) Dividends Paid Credit in General. For the purposes of this title, the dividends paid credit shall be the amount of dividends paid during the taxable year."

(f) provides:

"Distributions in Liquidation. In the case of amounts distributed in liquidation the part of such distribution which is properly chargeable to the earnings or profits accumulated after February 28, 1913, shall, for the purposes of computing the dividends paid credit under this section, be treated as a taxable dividend paid."

115 is entitled "Distributions by Corporations." (a) provides:

"Definition of Dividend. The term 'dividend' when used in this title * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, *or (2) out of the earnings or profits*

*of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made."* (The italicized portion appeared for the first time in the Revenue Act of 1936.)

(b) provides, so far as here material:

"Source of Distributions. For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits."

(c) provides:

"Distributions in Liquidation. * * * In the case of amounts distributed (whether before January 1, 1934, or on or after such date) in partial liquidation (other than a distribution within the provisions of subsection (h) of this section of stock or securities in connection with a reorganization) the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits *within the meaning of subsection (b) of this section for the purpose of determining the taxability of subsequent distributions by the corporation."* (The italicized portion appeared in the 1934 Revenue Act but was eliminated by the 1936 Act).

Some light is thrown upon the purpose and proper interpretation of these provisions by decisions in which they were before the court in one way or another. In Hellmich v. Hellman, 276 U.S. 233, 48 S.Ct. 244, 72 L.Ed. 544, 56 A.L.R. 379, the court, while not confronted with the same question as is here involved, had occasion to consider Sec. 201(a) of the Revenue Act of 1918 (115(a) of the 1936 Act), and 201(c) (115 (c) of the 1936 Act). The court on page 237 of 276 U.S., on page 245 of 48 S.Ct., 72 L.Ed. 544, 56 A.L.R. 379, stated:

"The Treasury Regulations correctly interpreted the Act as making section 201(a) applicable to a distribution made by a going corporation to its stockholders in the ordinary course of business, and section 201(c) applicable to a distribution made to stockholders in liquidation of the corporation."

This citation is relevant, so we think, as showing that 115(a) and 115(c) were applicable to different situations, the former to a going corporation and the latter to a going corporation and the latter to distributions made by a corporation in liquidation. The Supreme Court has also held that the legislative purpose of 115(a) and (b) was to prevent earnings or profits accumulated before March 1, 1913 from being distributed in such manner as to permit accumulations after that date to escape taxation. Helvering v. Canfield, 291 U.S. 163, 168, 54 S.Ct. 368, 78 L.Ed. 706; Foster v. United States, 303 U.S. 118, 120, 58 S.Ct. 424, 82 L.Ed. 700. The court in the Foster case also held that the distributions there made were in partial corporate liquidation and that their character and effect were to be determined by 115(c) and not by 115(a) and (b).

Our study, analysis and comparison of these various provisions lead us to the conclusion that 115(a) and (b) as decided by the Tax Court have no application to the instant situation. We are unable to perceive how (a) and (b) can be reconciled with (c) any more than 27(a) can be reconciled with 27(f). Petitioner's contention, if accepted, would reduce 27(f) and 115(c) to meaningless language. 27 (f) authorizes a corporation to treat as dividends paid the part of such distribution which is properly chargeable to earnings or profits, and 115(c) directs the stockholder to consider as earnings or profits that part of the distribution not properly chargeable to capital. We think it is impossible to reconcile this authority to the corporation on the one hand and this direction to the stockholder on the other with 115(a) and (b), which make no distinction between capital and earnings and profits as long as there are earnings and profits out of which distribution can be made. In other words, if all distributions are to be designated as dividends until the earnings and profits have been exhausted, we can think of no reason for the phrase "properly chargeable to the earnings or profits" in 27(f), or the phrase "properly chargeable to capital account" in 115(c).

In Fowler Bros. & Cox v. Commissioner, 6 Cir., 138 F.2d 774, the court considered a contention quite similar to that here advanced by petitioner. The court on page 778 of 138 F.2d, stated:

"For petitioner, in effect, claims that all distributions, whether chargeable to earnings or profits, or to capital account, must be considered as paid out of earnings by virtue of Section 115(b). Statutes

are to be construed by giving effect to the whole statute and every part thereof. Section 27(f) is, therefore, to be construed as though it provided that no distributions properly chargeable to capital account, are, for the purpose of computing the dividends paid credit, to be treated as taxable dividends paid."

Neither do we think that the amendment to 115(a) by the Revenue Act of 1936, or the elimination in the same Act of the reference in (c) to (b), alters the situation insofar as it affects the relation existing between (a) and (b) and (c). The amendment to (a) merely enlarges the definition of a dividend so as to include distributions from current earnings as well as those accumulated. Inasmuch as this amendment was first contained in the 1936 Act, which also provided for an undistributed profits tax, it would seem that its purpose was to permit distributions of current earnings so that the corporation would not be liable for such tax. The purpose of the elimination from (c) of the reference to (b) is not so easy to visualize. We are satisfied, however, that it was not the intention or purpose to make all distributions in liquidation under (c) from earnings and profits as provided in (b). We repeat that such a construction entirely ignores the positive direction which was not eliminated from (c) that "the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits."

■ Petitioner also suggests that one of the fallacies in applying 115(c) rather than 115(a) and (b) is that the former prescribes no order of distribution as between earnings and profits and capital. Failure in this respect perhaps was due to the numerous forms of corporate liquidations. In a partial liquidation, for instance, where only a part of the corporate stock is liquidated, such shareholders would not be entitled to all the earnings but only to the part represented by the shares liquidated. In that kind of liquidation, as well as in others which could be mentioned, it evidently would be unfair to charge such distributions first to the earnings and profits, as is contemplated in 115(b). The Tax Court determined that the amount distributed was properly chargeable to capital and accumulated earnings, respectively, in the ratio that each bore to the total of capital and earnings available for distribution. We think this determination was consistent with the requirements of 27(f) and 115(c); that is, it was a correct determination of the part "properly chargeable to the earnings or profits" under the former, and the part "properly chargeable to capital" under the latter. In fact, it seems clear that a determination of the part "properly chargeable to capital" and the part "properly chargeable to the earnings or profits", under the instant circumstances, call for the application of a proper system of accounting rather than that of a legal principle.

■ As already stated, 26(c) (3) and (f) were added retroactively by Sec. 501 of the Revenue Act of 1942, and petitioner contends that it is entitled to the benefit of these sections. The former allows a credit to corporations prohibited by law from paying dividends during the existence of a deficit in accumulated earnings. The credit is allowable for amounts not distributed because of a legal prohibition. True, we have sustained the holding of the Tax Court that petitioner's earnings and profits must first be used to absorb its deficit before the distribution could be claimed as a dividends paid credit. This holding, however, is because the distribution was made in partial liquidation. If petitioner had made its distribution as a going corporation, we would be confronted with a different situation. We are of the view that this section was for the benefit of a going corporation and not for one engaged in the distribution of its assets in partial liquidation.

■ 26(f) allows a credit in the "amount by which the adjusted net income exceeds the sum of (1) the earnings and profits accumulated * * *, as of the beginning of the taxable year, and (2) the earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year)." Petitioner advances a theory which is interesting, although we do not think it is tenable. Petitioner had no earnings accumulated at the beginning of the taxable year, so it uses the deficit which existed at that time as a minus quantity. Using the calculations resulting from the Tax Court's decision, it claims a deficit credit of $53,659.62. Instead of adding the earnings and profits for the taxable year to the accumulated profits at the beginning of the year (there were none),

it subtracts $46,624.09 (earnings and profits for the taxable year) from $53,203.-27 (deficit at the beginning of the year), which leaves a minus figure of $6,579.18. This amount is added to $47,080.44 (adjusted net income for the taxable year), which produces the amount claimed as a deficit credit. A reading of this section makes it rather plain, so we think, that the deficit referred to was not that existing at the beginning of the taxable year but was the difference between the adjusted net income for the year and the earnings for the year, plus the accumulated earnings existing at the beginning of the year. Treasury Regulation 94, promulgated after the 1942 Act amending the 1936 Act, in substance provides that a deficit existing at the beginning of the taxable year shall " * * * not be taken into consideration in determining the credit allowable under Sec. 26(f) * * *." Petitioner argues that this Regulation is in direct conflict with the section. We do not think so; in fact, as we view the situation, it is in conformity therewith. Even without the aid of the Regulation, we would be unable to accept the construction which petitioner seeks.

We do think, however, that petitioner is entitled to a credit under 26(f) in the sum of $456.35. This is the amount by which petitioner's "adjusted net income" exceeded its current earnings and profits for the taxable year. (See figures above.) The Tax Court did not allow this credit.

In No. 8536, petitioner (Commissioner) raises two issues decided adversely to him by the Tax Court: (1) Did the difference between the face amount of a note owed by respondent (taxpayer) to the Millikin National Bank, and the amount paid in its discharge, represent taxable gain to respondent or a gift to it by the bank? and (2) Was respondent entitled to deduct the amount of its organizational expenses as a loss sustained during the taxable year?

As to (1), we think a brief statement of the facts is sufficient to disclose the disputed issue. In March 1933, respondent borrowed $28,030.30 from the bank. The loan was evidenced by its note and a deed of trust. The note was payable March 23, 1938, and bore interest at 5% per annum to maturity and 7% from maturity to payment. The note was further secured by assignment of a $25,000 life insurance policy on the life of respondent's president, upon which he paid the premiums. The surrender value of the policy was carried on respondent's books as an asset. The note was not paid at maturity and the time of payment was extended for six months at an interest rate of 5%.

On June 25, 1938, certain officials of respondent met with officials of the bank and reached an agreement that respondent could satisfy the note for $28,030.30, plus accrued interest, for a cash payment of $20,000, provided respondent paid in full a note held by another bank (not involved in this proceeding). This agreement was carried out on the same date, and upon payment to the bank of $20,000 and the payment of the other note, the bank marked the note for $28,030.30 as paid. The difference between the principal amount of the note and the amount paid, to wit $8,382.08, is the amount involved under the issue now being considered. Respondent on its books credited gain and loss in that amount. The insurance policy held by the bank as collateral was retained by the bank, although the deed of trust given to secure the loan was released by the trustee.

As previously disclosed relative to another issue, respondent on July 5, 1938, entered into a contract for the sale of all its assets. Three days later the bank made demand on respondent for payment of the $8,382.08 of indebtedness which it had cancelled under the agreement reached with respondent on June 25, 1938. Respondent denied liability and demanded that the bank surrender the life insurance policy which it had received as collateral. (Respondent at that time owed no other obligation to the bank.) The bank refused to surrender the policy on the ground that it was holding it as collateral for the alleged unpaid balance of its note. The policy is still in possession of the bank.

On August 24, 1938, after the sale of respondent's assets, the bank brought suit against respondent and its stockholders for $8,382.08, plus additional interest. In brief, the bank charged that respondent fraudulently obtained cancellation of the note on June 25, 1938, by the making of certain false representations as to its financial condition. It was further alleged that the bank learned of such fraud when it became aware of the amount which respondent had received from the sale of its assets. Respondent denied all

allegations of fraud. The suit was tried in December 1940 in an Illinois state court and a verdict returned in favor of respondent. The verdict was set aside and the bank's motion for new trial allowed. The suit is still pending.

█ Petitioner increased respondent's gross income by the amount of $8,382.08 on the theory that it realized income to that extent upon the satisfaction of its indebtedness to the bank. The Tax Court on this issue held in favor of respondent.

Respondent relies upon Helvering v. American Dental Co., 318 U.S. 322, 63 S.Ct. 577, 87 L.Ed. 785, while petitioner relies upon United States v. Kirby Lumber Co., 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131. We do not think any useful purpose could be served in analyzing these two decisions or in attempting to determine whether the Kirby decision is overruled by the Dental case. In our opinion, the instant facts come within the rationale of the latter. The court on page 331 of 318 U.S., on page 582 of 63 S.Ct., 87 L.Ed. 785, stated:

"The forgiveness was gratuitous, a release of something to the debtor for nothing, and sufficient to make the cancellation here gifts within the statute."

That statement, in our judgment, is squarely applicable to the instant situation. We therefore agree with the Tax Court that under the Dental case this issue must be decided against petitioner.

What we have said is on the assumption that the transaction between the parties represented a forgiveness of respondent's indebtedness to the bank. Without the obstacle of the Dental case, we doubt if petitioner could sustain his contention. It is true, no doubt, that the parties on June 25, 1938, thought there had been a forgiveness of the obligation. As it turned out, however, this was an erroneous conception of what had happened. At any rate, the bank shortly afterward disputed any purpose to forgive by bringing a suit to set aside the transaction on the grounds that its consent thereto was obtained by respondent's fraud. Certainly it cannot be maintained that there was a complete forgiveness of the debt on the part of the bank. We are of the view, under such circumstances, that no taxable gain can properly be charged to respondent. Surely the bank would have been in no position to claim a loss for the taxable year on account of this alleged cancellation of respondent's indebtedness. With the insurance policy as collateral still in its possession and with a suit pending to set aside the transaction as fraudulent, we doubt if the bank would have any standing before the tax authorities or a court. On the same theory, no gain accrued to respondent which could be designated as taxable income.

█ The second issue raised by petitioner concerns the allowance to respondent by the Tax Court of an item of $796.-09 as a loss sustained during the taxable year. The item represented respondent's organization expense incurred in 1929, which was carried on its books as a capital expenditure. No issue was or is raised but that respondent was entitled upon dissolution of the corporation to take this item as a deduction. It is the position of petitioner, however, that it was not properly taken in the taxable year for the reason that the dissolution had not been consummated. Many times we have heard it urged by the respondent that the Tax Court's finding as to the proper year for taking a deductible loss is conclusive if reasonably supported. We have heretofore related and discussed respondent's situation in relation to the steps taken to dissolve during the taxable year and need not repeat. Petitioner argues that respondent's franchise rights had not been terminated, as its intention to dissolve was revokable. That contention might have some plausibility except for the fact that respondent was under contract obligation not only to dissolve but to cease engaging in business of any kind. Moreover, it had actually ceased all operations except those necessary to wind up its affairs. Under these circumstances, we are of the view that its franchise became worthless during the taxable year and that the express intention to dissolve could not have been revoked if respondent had so desired. We think the factual situation amply supports the Tax Court's conclusion that the loss occurred during the taxable year.

Certain other minor questions have been raised by the parties which we have considered and think are without merit.

The decision of the Tax Court is affirmed, with the exception of the one item which we have decided in favor of the taxpayer, and as to such, the Tax Court is directed to allow credit under 26(f) of the Revenue Act of 1936 as amended by the Act of 1942, in the sum of $456.35.