## NORDBERG MFG. CO. v. KUHL.

### No. 9357.

Circuit Court of Appeals, Seventh Circuit.

Feb. 26, 1948.

Frederic Sammond and Theodore C. Bolliger, both of Milwaukee, Wis. (Miller, Mack & Fairchild, of Milwaukee, Wis., of counsel), for appellant.

Sewall Key, Acting Asst. Atty. Gen., Helen Goodner, Sp. Asst. to the Atty. Gen., Timothy T. Cronin, U· S. Atty., and E. J. Koelzer, Asst. U. S. Atty., both of Milwaukee, Wis., Theron Lamar Caudle, Asst. Atty. Gen., and Helen R. Carloss, and Lee A. Jackson, Sp. Assts. to the Atty. Gen., and E. J. Neuland, Tax Division, Dept. of Justice, of Washington, for appellee.

Before SPARKS, KERNER and MINTON, Circuit Judges.

SPARKS, Circuit Judge·

Plaintiff appeals from a judgment of the District Court dismissing its suit to recover taxes alleged to have been illegally assessed for the year 1937, upon denial of its claim for dividends paid credit. The question presented is whether certain distributions to preferred stockholders of the taxpayer were dividends for which a credit was to be allowed on taxpayer's surtax on undistributed profits for the year 1937, or were amounts in partial liquidation of the stock,

not properly chargeable to earnings and profits. The court held that because the distributions were made pursuant to a plan agreed upon in February, 1937, contemplating application of all dividends or other payments to the retirement of the preferred stock within a period of eight years or less, which plan was actually consummated by the close of the year 1940, the taxpayer was not entitled to the credit claimed.

There is no dispute as to the facts of this case which were largely stipulated. The taxpayer is a manufacturer of heavy machinery, several items of which had, prior to 1928, been covered by patents held by the Symons brothers. In 1928, the latter, desiring to withdraw from active participation in the business, turned over their patents and other interests therein to the taxpayer, acquiring 6½ and 6% preferred stock of a par value of $1,160,000 in part payment therefor. As a result of losses during the depression, the taxpayer was unable to pay the dividends on this stock which, by the end of 1936, had accrued to the amount of $372,457. The rate of accrual was $74,491 a year. The Symons, therefore, attempted to work out a plan which would afford some incentive to management to continue the business and at the same time provide them with some cash returns for their stock. They proposed, in effect, that they would surrender their stock without payment on the principal indebtedness if, within an eight year period, taxpayer would pay past accrued dividends, and dividends accruing during the period.

As finally agreed upon, the contract provided for the payment of $1,000,000 on the 11,600 shares of both stocks outstanding, $86.21 a share, an amount not substantially more that the dividends accrued or accruing up to the contemplated date of complete execution of the agreement. Provision was made for the deposit of the stock in escrow, and payment of all dividends declared by the taxpayer to the depositary for distribution to the depositors. Provision was further made for the payment each quarter year of whatever amount was necessary in addition to declared dividends to bring payments up to a total of $125,000 for each year, and for anticipation of later due payments, with discount of 6% a year for the period any quarterly requirements were so anticipated. Upon receipt by the depositary of dividends and other payments in compliance with the minimum yearly requirements of $125,000 aggregating $1,000,000, less allowance for discount on advance credits, the stockholders were to have no rights to further dividends on the deposited stock, and the depositary was to surrender to the taxpayer all the preferred stock held by it under the terms of the agreement.

Contemplating the possibility that the taxpayer would be unable to make the minimum annual payments provided by the agreement, the parties agreed that that agreement should create no obligation on its part to make the payments, nor should the depositary have any right to enforce such payments, stockholders' rights being limited to return of their preferred stock in case of default, and, in such case, any payments theretofore made pursuant to the agreement could be applied to accrued dividends on the stock, with a notation of such liquidating dividend to be stamped on the face of each certificate before delivery to the depositor. However, the depositary was to take no action pursuant to the default except upon 60-day notice in writing to the taxpayer upon the request of at least 35% of the stockholders, after which the stock was to be delivered to the depositors and the agreement terminated.

Payments aggregating $109,890 (the fund here involved) were made during the year 1937 pursuant to the agreement. These were treated as dividends on the books of the taxpayer and were charged to earned surplus. Similar distributions were made during the following years which brought the total up to $782,167, including a final payment of $347,192 on December 26, 1940, in discharge of all future payments, after which the preferred stock was surrendered by the depositary to the taxpayer.[1] This final payment was not charged to earned

---

[1] At this date, 9409 shares of both issues remained outstanding, the taxpayer having earlier in the same year, 1940, purchased deposit receipts directly from the holders of 766 shares covered by such receipts.

surplus on the taxpayer's books; instead according to the stipulation of facts, "the accounting entries effected elimination of the Preferred Stock Capital Account, and the Capital Surplus Account was increased by the amount which the par value of the retired preferred stock exceeded the final payment made on December 26, 1940·" A letter to the depositary accompanying the final distribution stated that the taxpayer desired to exercise its privilege to anticipate the payment of all future requirements for the purpose of acquiring full title to all shares of preferred stock deposited pursuant to the agreement and of cancelling and retiring the same.

Appellant contends that because it could not be known until a subsequent time whether or not the agreement would be carried out and the distributions used as dividends, and because the agreement itself carried no obligation to make any payments, it was no more than an option, and the distributions made retained their ordinary character as dividends and were not changed to purchase payments until the actual exercise of the option. It further contends that even though the distributions be considered as in partial liquidation, it is still entitled to the credit under the definition of dividends contained in the statute.

The sections of the Revenue Act of 1936 here pertinent are set forth in the margin.[2]

It will be seen that under the portions of the statute set forth, the taxpayer is entitled to the credit here claimed if the distributions were in fact ordinary dividends or, even if in liquidation, if they were properly chargeable to earnings and profits accumulated after February 28, 1913, but not if they were properly chargeable to capital account. See Fowler Bros. and Cox v. Commissioner, 6 Cir., 138 F.2d 774.

Although appellant argues to the contrary, we think there can be little doubt but that the distribution was one in partial liquidation within the definition of section 115(i), one of a series of distributions in complete cancellation or redemption of a

---

[2] Sec. 14. *"Surtax on Undistributed Profits*

"(a) *Definitions.* As used in this title—

"(1) The term 'adjusted net income' means the net income minus the sum of—

"(A) The normal tax imposed by section 13. * * *

"(2) The term 'undistributed net income' means the adjusted net income minus the sum of the dividends paid credit provided in section 27 * * *.

"(b) *Imposition of Tax.* There shall be levied * * * upon the net income of every corporation a surtax * * *: * * * per centum of the portion of the undistributed net income which is not in excess of * * * per centum of the adjusted net income." 26 U.S. C.A. Int.Rev.Acts, page 823.

Sec. 27. *"Corporation Credit for dividends Paid*

"(a) *Dividends Paid Credit in General.* For the purposes of this title the dividends paid credit shall be the amount of dividends paid during the taxable year. * * *

"(f) *Distributions in Liquidation.* In the case of amounts distributed in liquidation the part of such distribution which is properly chargeable to the earnings or profits accumulated after February 28, 1913, shall, for the purposes of computing the dividends paid credit under this section, be treated as a taxable dividend paid." 26 U.S.C.A. Int. Rev.Acts, pages 837, 838.

Sec. 115. *Distributions by Corporations.*

"(a) *Definition of dividend.* The term 'dividend' when used in this title * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year * * *

"(b) *Source of distributions.* For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits * * *

"(c) *Distributions in liquidation.* Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. * * * In the case of amounts distributed (whether before January 1, 1934, or on or after such date) in partial liquidation * * * the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits.

* * * * * * *

"(i) *Definition of partial liquidation.*

portion of its stock. It was made pursuant to an agreement very advantageous to the taxpayer, enabling it to extinguish its entire liability on two stock issues of over one million dollars par value by the payment of amounts aggregating very little more than the actual dividends accrued up to the date of the agreement plus sufficient to cover accruals to the date of the actual completion of payments under the plan. In fact, taking advantage of the discounts for advance payments, instead of making the eight annual payments of $125,000 aggregating one million dollars, the taxpayer was able to extinguish the entire liability by payments aggregating $782,167 within less than four years. The fact that it called all but the last of these payments "dividends" does not appear to us to be conclusive of their actual character. Jones v. Dawson, 10 Cir., 148 F.2d 87; Yankey v. Commissioner, 10 Cir., 151 F.2d 650. Each was a part of a series looking toward the same result, the surrender and cancellation of the preferred stock. It was only in the event of default coupled with a request on the part of the holders of 35% of the outstanding preferred stock that the agreement was to be terminated, in which case "any and all payments or distributions" theretofore made were to be applied "to the extent necessary to satisfy any accrued dividends," with any surplus applied as a liquidating dividend upon such stock, each certificate of which was to be stamped with the amount cancelled prior to its return to the holder. Thus, while the agreement imposed no binding obligation upon the taxpayer to make the payments provided, we think it is implicit in the language used that such payments were to be applied in the execution of the liquidation plan unless two events subsequently occurred, default, and a request for termination by the requisite number of stockholders. The fact that the execution of the plan was optional with the taxpayer is immaterial in view of the fact that it was actually carried out in accordance with its terms.

We agree with the District Court that, considering the entire transaction, the conclusion is inescapable that the payments in 1937 were in partial liquidation of the preferred stock.

There remains the question whether, even if they were in partial liquidation, they may still be entitled to the credit permitted by section 27(f) if properly chargeable to earnings or profits. We are convinced that they were not, but instead, were properly chargeable to capital account under the provision of section 115(c). We note that while the payments for the various years were all similar items in a series looking to the same final result, the taxpayer did not treat them in the same manner, designating all but the final payment of December 26, 1940, as dividends, and charging them to earned surplus on its books. With the last one, however, which was not designated a dividend, entries were made in the books which properly reflected the entire transaction by effecting the elimination of the preferred stock capital account. The fact that the capital surplus account was increased only by the amount which the par value of the retired stock exceeded the final payment rather than the sum of all the payments does not appear significant. The important fact is that, as a result of the entire series of distributions made pursuant to the agreement of February, 1937, the entire issues of preferred stock were eliminated for an amount less than their par value, thus leaving nothing to be charged to earned surplus on the books. That being the case, the entire series of distributions, including those of 1937, were properly chargeable to capital account, hence, under section 115(c) could not be considered as distributions of earnings or profits, and could not be entitled to the dividends paid credit provided by section 27(a) or (f). Fowler Bros. and Cox v. Commissioner, supra; Shellabarger Grain Co. v. Commissioner, 7 Cir., 146 F.2d 177.

Judgment affirmed.

---

As used in this section the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." 26 U.S.C.A. Int.Rev.Acts, pages 868, 871.