Monte **MANSFIELD** and **Eleanor**
**Mansfield**

v.

**UNITED STATES.**

No. 319–56.

United States Court of Claims.
March 5, 1958.

Lloyd Fletcher, Washington, D. C., for plaintiffs. Scott P. Crampton, Washington, D. C., was on the briefs.

George Willi, III, Washington, D. C., with whom was Asst. Atty. Gen., Charles K. Rice, for defendant. James P. Garland, Washington, D. C., was on the brief.

LITTLETON, Judge.

Plaintiffs brought this action to recover income taxes paid for the calendar year 1951 in the amount of $17,467.58 plus interest paid thereon together with interest on the total overpayment as required by law.[1]

The facts, undisputed by the parties, are as follows: Plaintiff Monte Mansfield operated a Ford automobile agency in Tucson, Arizona, as a sole proprietorship until January 1, 1948, at which time he formed a corporation ultimately known as the Monte Mansfield Investment Company, hereafter referred to as Investment. To this corporation he transferred all of the proprietorship assets, receiving in return substantially all of the corporation's capital stock except qualifying shares. This transaction was a tax-free exchange under section 112(b)(5) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 112(b)(5).[2] During

---

1. Eleanor Mansfield is a plaintiff in this case merely because she and her husband filed a joint federal income tax return in 1951. These taxpayers keep their books and file their tax returns on cash receipts and disbursements basis by calendar years.

2. Section 112. "Recognition of gain or loss—

"(a) General rule. Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

"(b) Exchanges solely in kind— * *

"(5) Transfer to corporation controlled by transferor. No gain or loss

1948, Investment accumulated earnings and profits (earned surplus available for declaration of dividends) in the amount of $31,336.92. On January 1, 1949, the corporation entered into a tax-free exchange [3] with a newly formed subsidiary corporation, Monte Mansfield Motors, hereafter referred to as Motors. Under this reorganization, Investment transferred a portion of its assets and a portion of its liabilities to Motors in exchange for all of the issued and outstanding capital stock of Motors amounting to 312 shares having a par value of $100 a share, and representing the excess of the value of the portion of the assets of Investment transferred to Motors over the amount of the liabilities of Investment assumed by Motors in the amount of $31,224.10. (The excess of $24.10 contained in the net worth of Motors on January 1, 1949 was not sufficient to justify the issuance of another share of capital stock and was carried on the books of Motors as paid-in surplus.)

After the above described exchange of January 1, 1949, the assets of Investment consisted of the 312 shares of Motors capital stock, a building and fixtures therein, the land on which the building was located, and prepaid insurance on the building.

At the time of the above described exchange between Investment and Motors on January 1, 1949, the two corporations gave no thought to what disposition should be made of the $31,336.92 representing the 1948 earnings and profits of Investment, and the books and records of Investment after the exchange on January 1, 1949 reflected an earned surplus of this exact amount. The books of the two corporations show no allocation of the $31,336.92 to assets transferred to Motors and those retained by Investment.

From 1949 to the middle of 1951 Motors earned substantial net incomes but paid no dividends to its sole stockholder, Investment. During this same period, Investment received from Motors rental payments constituting its sole source of income. On July 1, 1951, Investment was liquidated in a nontaxable exchange,[4] and plaintiff Monte Mansfield surrendered his Investment stock and received in return all of Investment's assets consisting of the land, building, and fixtures and the 312 shares of Motors capital stock.

Plaintiffs filed a joint federal tax return in 1951, electing under section 112 (b)(7) to postpone taxation of gain on the property received in the corporate liquidation of Investment by currently reporting their ratable share of Investment's earnings and profits as dividends taxable as ordinary income. Plaintiffs did not report as a dividend any part of Investment's $31,336.92 earnings and profits from 1948, reporting only the $1,572.37 accumulated by Investment subsequent to the creation of Motors, i. e., from January 1, 1949 to July 1, 1951.

The Commissioner of Internal Revenue determined that the earnings and profits of Investment taxable to plaintiffs as a dividend under section 115 of the

shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. * * * "

3. Both plaintiffs and defendant regarded this transaction as tax-free, but differed

as to the applicable section of the Internal Revenue Code. Plaintiffs considered this exchange as tax-free under the provisions of section 112 (b) (4), (g) (1) (D) and (g) (2) of the Internal Revenue Code of 1939. Defendant regarded and now regards that exchange as subject to the provisions of section 112(b) (5) of the Internal Revenue Code of 1939 and therefore tax-free.

4. This exchange was made pursuant to section 112(b) (7) of the Internal Revenue Code of 1939.

Internal Revenue Code of 1939 [5] consisted not only of the $1,572.37 earned by Investment subsequent to January 1, 1949 and reported by plaintiffs as a taxable dividend, but also consisted of the $31,336.92 earned by Investment in 1948 prior to the creation of Motors, and carried on the books of Investment as of January 1, 1949. In accordance with such determination, the Commissioner of Internal Revenue assessed a deficiency against the plaintiffs. They paid the deficiency asserted against them, filed a timely claim for refund, and instituted this action more than six months thereafter as provided by 3772 of the Internal Revenue Code of 1939.

In the instant suit [6] plaintiffs are not now claiming, as they apparently did in their tax return filed for 1951, that no part of Investment's $31,336.92 earnings and profits from 1948 were taxable to them as a dividend. Plaintiffs do contend, however, that the Commissioner erred in determining that the entire sum was taxable to them as a dividend. It is plaintiff's position that under applicable law they are entitled to allocate the 1948 earnings and profits of Investment between Investment and Motors for tax purposes. They do not contend that any such allocation was actually made at the time of the transfer by Investment of some of its assets and liabilities to Motors on January 1, 1949, or that the earnings and profits of $31,336.92 were, in whole or in part, actually transferred to Motors at any time. The plaintiffs concede that the books and records of Investment reflect earnings and profits of $31,-336.92 as of January 1, 1949, but they contend that regardless of that fact there *must*, in this kind of transaction, be an allocation of those earnings and profits. In other words, plaintiffs say that, in this type of tax-free exchange, the law will presume an allocation whether or not, at the time of the exchange, one was made or intended.[7]

Plaintiffs base their argument for an allocation by operation of law on certain case law and a Treasury regulation which they claim provide for an allocation of earnings and profits in such a divisive reorganization or exchange. The plaintiffs assert that the "proper" method of making such allocation, in the instant case, is to allocate earnings to assets transferred and to those retained on the basis of their demonstrated earnings record, i. e. allocate the earnings to the asset which made the earning, which according to plaintiffs' theory would result in an allocation of $3,398.71 to Investment and $27,938.21 to Motors.

The Government takes the position that the amount of the parent corporation's earnings and profits available for distribution to its stockholders is unaffected by an exchange such as occurred

---

5. Section 115 of the Internal Revenue Code of 1939 in pertinent part reads as follows:
   "The term 'dividend' * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) *out of its earnings or profits* accumulated after February 28, 1913, or (2) *out of the earnings or profits* of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *" [Italics supplied.]

6. This suit is based on two grounds: (1) that the Commissioner erroneously failed to make an allocation of surplus (earnings and profits) between the two

corporations with the result that he overstated the available earnings and profits in Investment at the time of its liquidation in 1951 and (2) that the Commissioner understated the depreciation deduction on the improved real estate received by plaintiffs on said liquidation. The parties have agreed that the depreciation problem will be deferred and treated as a matter for consideration under Rule 38(c), 28 U.S.C.A., after the court has decided the allocation question.

7. Under the plaintiffs' theory of the case, even if the corporate parties to the exchange on January 1, 1949 had intended to transfer the earnings and profits in their entirety to Motors, the applicable law, as interpreted by plaintiffs, would require that some of those earnings and profits be allocated back to Investment.

between Investment and Motors in 1949, and that no allocation is required, because the net worth of Investment was not affected by the exchange in which Investment received back all of the capital stock of Motors. Alternatively, the Government urges that if the tax-free exchange of a portion of Investment's tangible business assets in return for Motors' stock does require an allocation of the transferor's previously accumulated earnings and profits, such allocation should be in proportion to the percentage of Investment's net book value of assets transferred compared to the net book value of those assets retained.

We are of the opinion that neither Treasury Regulation 118, section 39.115 (a)–3(a), nor most of the cases relied upon by plaintiffs, require an allocation by operation of law of earnings and profits in a tax-free exchange where, as here, (1) only a portion of the transferor's assets is transferred to the new corporation in exchange for all of the capital stock of the new corporation (the capital stock of the new corporation went to the old corporation and not to the shareholders of the old corporation), (2) where both corporations continue in existence after the exchange, (3) where the parties to the exchange did not, at the time of the exchange, intend or indeed make any allocation and (4) the earnings and profits of the transferor corporation actually remained on the books of that corporation after the exchange.

Treasury Regulation 118, section 39.115(a)–3(a) is not an absolute requirement for an allocation in all kinds of tax-free exchanges. We are of the opinion that the regulation merely requires a "proper" allocation once it is established that an allocation is necessary at all. Inasmuch as the regulation is a codification of the Internal Revenue Code section dealing with the effect of tax-free exchanges upon dividends, as that section has been interpreted by the courts, we shall next consider the cases in point.

Most of the cases cited by plaintiffs can be distinguished by the fact that the transferor corporations involved therein transferred all of their assets to the transferee corporations, and the transferor corporations were simultaneously liquidated. In the instant case, as noted above, only part of the assets of the transferor corporation was transferred, and the transferor corporation was not liquidated at the time of the transfer nor as a part of the same transaction.

In Commissioner of Internal Revenue v. Sansome, 2 Cir., 1932, 60 F.2d 931, certiorari denied Sansome v. Burnet, 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575, the taxpayer bought stock in corporation A which had accumulated earnings and profits. Corporation A subsequently transferred *all* of its assets and liabilities to the newly formed B corporation, and the stockholders in A corporation received five shares of B corporation's stock for each share of A with no change in the proportions of their holdings. At the time of the exchange corporation A was liquidated, and corporation B, making no profits while in operation, was liquidated two years later. The taxpayer did not report his liquidating distribution as a dividend but treated it as a return of capital. The court held that since no gain was recognized in the tax-free exchange two years earlier whereby B was created, the profits of A were earnings and profits of B, the successor corporation, and the distribution to the taxpayer was a distribution of dividends out of the earnings and profits of B corporation taxable as ordinary income.

As indicated above, the Sansome case can be distinguished from the instant case in several ways. In the Sansome case, *all* of the transferor corporation's assets were given to the transferee without receiving anything in return, whereas in the instant case only part of Investment's assets were transferred and all of the stock of the transferee corporation was received by Investment in exchange. The transferor corporation was completely liquidated in Sansome, but here Investment remained in opera-

tion as a going concern for two and a half years thereafter. Since *all* of the assets had been transferred and the transferor corporation liquidated in the Sansome case, the transferor's earnings and profits had to go to the successor corporation or nowhere, whereas, in the instant case, there is no such necessity, because the earnings and profits can and did remain with the transferor. The type of allocation involved in the Sansome case was a choice of whether or not the earnings would go to the surviving corporation or disappear altogether, but the type of allocation urged upon us by plaintiffs is a dividing up of profits between two existing corporations by operation of law. We think this is an erroneous theory.

In the Sansome case, the stockholders in the original corporation became, as a result of the tax-free exchange, the stockholders in the successor corporation, whereas in the instant case the stockholders of Investment remained the stockholders of Investment after the tax-free exchange on January 1, 1949, and their interest in Investment was unaffected by the 1949 tax-free exchange. It was Investment that became the sole stockholder of Motors. The instant case is not a situation where the stockholder has surrendered his stock in one corporation and received stock in another corporation. What has happened here is that Investment, as a result of the tax-free exchange of January 1, 1949, changed the composition of its assets and, in place of certain physical assets, it had after the 1949 exchange the 312 shares of Motors' stock which had a value identical to the assets transferred to Motors. The net worth of Investment was the same after the 1949 exchange as it was immediately prior thereto.

The Sansome rule has been applied to many different situations such as liquidations of a subsidiary by its parent, Robinette v. Commissioner, 9 Cir., 1945, 148 F.2d 513, and mergers of two corporations to form a third, Commissioner of Internal Revenue v. Munter, 1947, 331 U.S. 210, 67 S.Ct. 1175, 91 L.Ed. 1441. In Harter v. Helvering, 2 Cir., 1935, 79 F.2d 12, the Sansome rule was applied to permit a parent corporation, in absorbing its subsidiary, to deduct its own deficit from the earnings and profits inherited from its subsidiary in computing the amount of earnings available for distribution as dividends. The Harter result was not applied in Commissioner of Internal Revenue v. Phipps, 1949, 336 U.S. 410, 69 S.Ct. 616, 93 L.Ed. 771, where the liquidated subsidiaries had deficits instead of earnings and profits.

In the Phipps case, the parent corporation had earnings and profits out of which dividends could be declared, but the five wholly-owned subsidiaries which were merged into the parent in a tax-free liquidation had an aggregate net deficit. The parent company effected the tax-free liquidation of the subsidiaries by distributing to itself all the assets and liabilities of the subsidiaries and redeeming and cancelling the stock of the subsidiaries. The taxpayers (stockholders in the parent corporation) argued that the net losses of the subsidiaries should be deducted from the earnings and profits of the parent so that the distribution made to stockholders would be a return of capital and not a dividend taxable as ordinary income. However, the court held that the tax-free liquidation did not affect the earned surplus held by the parent corporation, and the pro rata cash distribution to parent's preferred stockholders was a dividend within the meaning of section 115 of the Internal Revenue Code of 1939.

The Phipps case would appear on first reading to be inconsistent with Sansome and Harter. But the apparently different treatment of a deficit situation in the Phipps case was explained by the Supreme Court on the ground of a different congressional policy toward losses, in that Congress had explicitly provided that the tax effects of losses should be deferred and that losses cannot be realized in the way that earnings are "realized". The Supreme Court, in the Phipps case, also explained its decision by stating that the rule of the Sansome case was not grounded on a theory of continuity of corporate enterprise but on

the necessity to prevent the escape of earnings and profits from taxation. Earnings and profits, for tax purposes, are viewed as a tangible thing which cannot escape taxation by mere changes on accounting books.

Plaintiffs relied most heavily on the case of Reed Drug Co. v. Commissioner, 6 Cir., 1942, 130 F.2d 288, 289. The Reed case involved a situation where the parent corporation transferred *all* of its assets and liabilities to a subsidiary in exchange for all the capital stock of the subsidiary. Six months thereafter, the parent corporation was liquidated and at that time it distributed the shares of the subsidiary to its stockholders. At the time of its liquidation, the parent corporation claimed a "dividends paid credit" on the ground that such a distribution to its shareholders represented a distribution of dividends out of earnings and profits. The court held that the parent corporation was not entitled to the "dividends paid credit" and that the earnings and profits of the parent corporation had gone to the surviving subsidiary corporation six months prior to the parent's liquidation, at the time of the exchange, citing Sansome.

The Reed case can be distinguished from the instant case in that in the Reed case *all* of the parent's assets and liabilities were transferred to the subsidiary at the time of the exchange, and, in the Reed case, the court found that, for all practical purposes, the liquidation of the parent corporation was part of the same transaction and simultaneous with the transfer of *all* of its assets and liabilities. Furthermore, the exchange in Reed was not a mere substitution of part of the assets of the parent for stock of the subsidiary, as in the instant case, because in Reed the shareholders of the parent became the shareholders of the subsidiary, whereas in the instant case the shareholders of the parent (Investment) continued to be the shareholders of the parent.

Although the Phipps case stated that the rationale of the Sansome case was the necessity to prevent the escape of earnings and profits from taxation and not the continuity of corporate enterprise, cases following the Sansome rule prior to the Phipps decision had frequently spoken in terms of continuity of corporate life. See United States v. Kauffmann, 9 Cir., 1933, 62 F.2d 1045, and Reed Drug Co. v. Commissioner, supra. In the Reed case the court stated that:

"It is well settled that under the Revenue Statutes upon a nontaxable reorganization the accumulated profits or earned surplus of the liquidated corporation pass to the successor corporation with the same status and are available for the payment of dividends by the successor. Such corporate transactions limited to this extent do not break the continuity of the corporate life." [Citations omitted.]

Whether the rule of the Sansome case is based on continuity of corporate enterprise, as explained in the Reed case, or on the necessity to prevent escape of earnings and profits from taxation, as the Phipps case indicates, there is no reason to apply the rule to this case. Here, there is no continuation of a single corporate venture in the Sansome sense, because both Investment and Motors continued in existence. There is no danger here of having the earnings and profits escape from taxation, as defendant fears, because taxes will be paid when the earnings and profits are ultimately distributed, and if we found that part of the earnings and profits should be allocated to Motors, those earnings would be taxed as dividends when ultimately distributed, even if Motors had not earned any profits itself, and in that event the taxation might be delayed but not escaped. Under either theory of Sansom, there is no reason to apply the rule here. The real reason for not applying the rule to the instant case, however, is that the rule does not extend to the situation now confronting this court.

In Barnes v. United States, D.C., 22 F.Supp. 282, we encounter a factual situation more closely resembling that in

the instant case. In Barnes, the old corporation, in a tax-free reorganization, transferred only part of its net assets to the new corporation and the old corporation continued in existence for three years. The new corporation did not issue its capital stock to the old corporation as in the instant case, but to the shareholders of the old corporation. At the time of the exchange, the old corporation and the new corporation actually made an allocation of the earnings and profits of the old corporation between the two corporations. Three years later, the new corporation made a distribution to its stockholders part of which was from the earnings and profits which it had received from the old corporation at the time of the tax-free exchange. The stockholders of the new corporation contended that this distribution insofar as it represented earnings and profits of the old corporation was not taxable as a dividend, because it did not represent a distribution of the earnings and profits of the new corporation. The stockholders took the position that the distribution to them of the earnings and profits of the old corporation amounted to a return of capital of the new corporation. The court held that when part of the earnings and profits of the old corporation was transferred to the new corporation, they became earnings and profits of that new corporation and were available for distribution as dividends to the stockholders of the new corporation, and thus taxable to such stockholders as dividends. The court reached this result not only on the basis of the facts of the case, which involved an actual transfer of such earnings and profits to the new corporation, but by extending the Sansome rule to a situation which the court conceded was different on the facts from Sansome.

In Mandell, 5 T.C. 684, the old corporation transferred part of its net assets to the new corporation and continued in existence. The old corporation did not transfer or allocate any of its earnings and profits to the new corporation. In exchange for the net assets transferred to the new corporation, the old corporation received stocks and bonds of the new corporation which the old corporation immediately distributed to its shareholders, thus making its shareholders the shareholders in the new corporation. This resulted in a reduction in the net worth of the old corporation and also a reduction in the interest of the shareholders of the old corporation in such old corporation. Thereafter, the new corporation which had no earnings and profits of its own, made a distribution to its shareholders. The shareholders did not report the distribution as a dividend for tax purposes, but rather as a return of capital. The Tax Court held that under the Sansome rule it must be presumed that a proportionate amount of the earnings and profits of the old corporation followed those assets of the old corporation which were transferred to the new corporation and that the distribution to the shareholders of the new corporation was out of such earnings and profits of the old corporation which were now earnings and profits in the hands of the new corporation.

We do not think that the Sansome rule requires any such presumption and we would limit the application of the Sansome rule to cases in which the facts are identical or closely analogous with those in the Sansome case, i. e., where *all* of the assets and liabilities of the old corporation are transferred to the new corporation and where the old corporation is liquidated simultaneously with or as a part of the same transaction. We think that where less than all of the assets are transferred, the transferor corporation continues in existence, and no actual transfer of the earnings and profits of the transferor corporation is made to the new corporation, the rationale of the Sansome case is not applicable and we can find no justification in law or under the facts of this case for presuming that a portion of such admittedly retained earnings and profits *must* have gone to the new corporation.

No part of the earnings and profits of Investment was actually transferred to Motors at the time of the tax-free exchange on January 1, 1949, and we are

of the opinion that neither the case law nor the regulations require that, under the circumstances of this case any allocation of such retained earnings and profits be deemed to have been made as between the two corporations.

Accordingly, since Investment made no distribution between January 1, 1949 and the date of liquidation in 1951, the distribution upon liquidation included the entire amount of earnings and profits of $31,336.92 retained by Investment, and this amount is taxable to plaintiffs as a dividend within the meaning of section 115 of the Internal Revenue Code of 1939. Plaintiffs are not entitled to recover on this claim, and as to it the petition is dismissed. The depreciation deduction problem will be considered in further proceedings pursuant to Rule 38 (c).

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.