HELVERING, COMMISSIONER OF INTERNAL REVENUE, *v.* CANFIELD.*

No. 158. Argued December 13, 1933.—Decided January 15, 1934.

---

* Together with No. 212, *Thorsen* v. *Helvering, Commissioner of Internal Revenue,* certiorari to the Circuit Court of Appeals for the Ninth Circuit.

164

Mr. H. Brian Holland, with whom Solicitor General Biggs and Messrs. Sewall Key and Andrew D. Sharpe were on the brief, for the Commissioner of Internal Revenue.

Mr. Edwin H. Cassels, with whom Messrs. Barry Gilbert and Adolphus E. Graupner were on the brief, for Canfield and Thorsen.

Mr. Chief Justice Hughes delivered the opinion of the Court.

These cases present the question of the construction of the following provisions of § 201 of the Revenue Act of 1921, 42 Stat. 228:

" Sec. 201. (a) That the term ' dividend '. when used in this title . . . means any distribution made by a corporation to its shareholders or members, whether in cash or in other property, out of its earnings or profits accumulated since February 28, 1913, . . .

"(b) For the purposes of this Act every distribution is made out of earnings or profits, and from the most recently accumulated earnings or profits, to the extent of such earnings or profits accumulated since February 28, 1913; but any earnings or profits accumulated or increase in value of property accrued prior to March 1, 1913, may be distributed exempt from the tax, after the earnings and profits accumulated since February 28, 1913, have been distributed. . . ."

The respondent in No. 158 and the petitioner in No. 212 are stockholders of the West Side Lumber Company, a California corporation. The question is as to the amount

properly taxable against them as their respective shares of a dividend of $5,100,000 paid by that company on April 14, 1923.

The findings of fact state that in addition to its original capital of $1,500,000, the company had a surplus on March 1, 1913, of $4,332,684.78. Its profits and losses in the following years—ending on February 28 in each year—were as follows: 1914, a profit of $4,594.62; 1915, a loss of $193,139.67; 1916, a loss of $211,707.32; 1917 to 1923, inclusive, and from February 28, 1923 to April 14, 1923, profits aggregating $2,450,688.30. Prior to the dividend here involved, and for the years 1918 to 1923, the company had paid dividends amounting to $1,290,000.

The question is as to the proper treatment of the losses of 1915 and 1916. If these losses, over the profits of 1914, are not treated as reducing the surplus of March 1, 1913, but are charged against the subsequent profits, the entire amount of that surplus, or $4,332,684.78 was distributable exempt from the tax after the profits subsequent to February 28, 1913, had been distributed. On this basis, for which the taxpayers contend, the profits accumulated after February 28, 1913, would be deemed to amount to $2,050,435.93, leaving subject to the tax, after deducting prior dividends, the sum of $760,435.93.

If the losses of 1915 and 1916, over the profits of 1914, are treated as reducing the surplus of March 1, 1913, there remained of that surplus, on February 28, 1916, the sum of $3,932,432.41, which was distributable exempt from the tax after the subsequent profits had been distributed. With this application of the losses of 1915 and 1916, the subsequent profits subject to tax, after deducting prior dividends, amounted to $1,160,688.30.

The Board of Tax Appeals adopted the latter view and directed the determination of deficiencies accordingly. 24

B.T.A. 480. That decision was overruled by the Circuit Court of Appeals for the Seventh Circuit as to the respondent Canfield in No. 158, 62 F. (2d) 751, and was sustained by the Circuit Court of Appeals for the Ninth Circuit as to the petitioner Thorsen in No. 212, 65 F. (2d) 234. The cases come here on certiorari.

In deciding between these conflicting views, the outstanding, and we think the controlling, fact is that on February 28, 1916, the surplus of March 1, 1913, had actually been diminished by losses. The company continued in business after March 1, 1913, and exposed its accumulated profits to the hazard of that business. On February 28, 1914, the company still had those profits and an additional profit of $4,594.62. But in the next two years the company lost $404,846.99, so that the surplus of March 1, 1913, was invaded. It is inaccurate to say that this was merely a matter of bookkeeping. Under the findings of fact the losses must be deemed to have been actual losses, not mere bookkeeping entries. Hence, the decrease of the preëxisting surplus was actual—as real as the preëxisting surplus itself, as real as the subsequent profits. The surplus of March 1, 1913, was the amount of net assets over liabilities including capital stock.[1] When the losses of 1915 and 1916 were suffered, the net assets of March 1, 1913, shrunk accordingly.

In the presence of that inescapable fact, the question is not whether the company could distribute, as being surplus of March 1, 1913, what no longer remained of that surplus—a manifest impossibility—but whether, the statute entitled the company to treat subsequent profits as restoring what had been lost of the surplus of March 1, 1913, so that, to the extent of that replacement, the subsequent profits could be distributed to stockholders free

[1] *Edwards* v. *Douglas*, 269 U.S. 204, 214; *Willcuts* v. *Milton Dairy Co.*, 275 U.S. 215, 218.

of tax. That the question is one of such a replacement would be strikingly evident if the whole of the surplus of March 1, 1913, had been lost and an attempt had been made to treat later profits as restoring it. The fact that only a part of the surplus was lost does not alter the question as related to that part.

The argument that the surplus of March 1, 1913, constituted capital is unavailing. We are not here concerned with capital in the sense of fixed or paid-in capital, which is not to be impaired, or with the restoration of such capital where there has been impairment.[2] No case of impairment of capital is presented. We are dealing with a distribution of accumulated profits. Nor is it important that the accumulated profits, as they stood on March 1, 1913, constituted capital of the company as distinguished from the gains or income which the company subsequently realized.[3] When a corporation continued in business after March 1, 1913, the dividends it later declared and paid to its stockholders, whether out of current earnings or from profits accumulated prior to that date, constituted income to the stockholders, and not capital, and were taxable as income if the Congress saw fit to impose the tax. *Lynch* v. *Hornby*, 247 U.S. 339. The provision of the Act of Congress under consideration was a " concession to the equity of stockholders " with respect to receipts as to which they had no constitutional immunity. There is no question here of the receipt of " capital."

The fundamental contention of the taxpayers is that the statute created two distinct periods for tax purposes; that the accumulations for each period constituted " a

---

[2] Compare *Hadden* v. *Commissioner*, 49 F. (2d) 709.

[3] *Southern Pacific Co.* v. *Lowe*, 247 U.S. 330; *Gulf Oil Corp.* v. *Lewellyn*, 248 U.S. 71; *Lucas* v. *Alexander*, 279 U.S. 573; *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552.

fixed and static amount, not to be changed by happenings. after the end of the period." That the statute does relate to two periods, the dividing line being March 1, 1913, and that the periods are distinct, is obvious. But it does not follow because there are two distinct periods that the accumulations for each period constitute " a fixed and static amount " and are to remain unaffected despite the vicissitudes of business. To attribute to the accumulated profits or surplus of March 1, 1913, embarked in a continued business, such a static condition is to ignore the course of business and to impute to the Congress an intention to consider, for tax purposes, the existence of that surplus as still continued notwithstanding its actual diminution or exhaustion. Such an intention to disregard realities so as to afford immunity from a tax is not lightly to be ascribed to the taxing authority. The " equity of stockholders," which we said in *Lynch* v. *Hornby, supra,* the Congress probably had in view, might reasonably require freedom from taxation on receiving a distribution of the accumulated profits of March 1, 1913, where those profits remained intact, but that equity is not apparent when those profits had been lost in whole or in part and immunity is sought from the taxation of an equivalent amount of profits subsequently earned.

Paragraphs (a) and (b) of § 201 disclose a single purpose and are to be construed in harmony with each other. They show that the Congress was careful to arrange its plan so that the right to receive, free of tax, a distribution of surplus accumulated prior to March 1, 1913, should not be exercised in such a fashion as to permit profits accumulated after that date to escape taxation. To that end the Congress provided that " every distribution is made out of earnings or profits, and from the most recently accumulated earnings or profits, to the extent of such earnings or profits accumulated since February 28, 1913." Then follows the exemption which is strictly limited to a

distribution of profits accumulated prior to March 1, 1913. Nothing is said as to a restoration of those profits out of subsequent earnings if the former have been lost.

The argument for the stockholders stresses the word " accumulated." We think that the expression is made to carry too heavy a burden. The argument is substantially the same as that which is based on what seems to us to be an artificial conception of the two periods. What had been " accumulated " prior to March 1, 1913, was obviously not immune from the risk of loss. It is urged that the same rule should be applied whether the losses in the subsequent years preceded or succeeded the making of profits. But the actual course of events is not to be ignored. If there had been profits immediately after March 1, 1913, sufficient in amount to absorb later losses incurred before the time of distribution, it is manifest that the profits accumulated prior to March 1, 1913, would have remained intact. The case is different where, in the absence of such profits, losses necessarily diminish the prior accumulations. Thus, in the instant case there were no profits accumulated after March 1, 1913, and prior to February 28, 1916, except the small amount in 1914 which was wiped out by the losses of the two succeeding years. The profits from February 28, 1916, to February 28, 1919, amounted to $327,134.45. If there had been a distribution of these profits on February 28, 1919, it could not have been maintained that they constituted part of the surplus existing on March 1, 1913, or that they should escape taxation on the theory that they made good prior losses which had actually reduced that surplus. And the same is true of the profits subsequently made. Administrative practice appears to have been in accord with this view. See A.R.M. 82, 3 Cumulative Bulletin 36 (1920).

Our conclusion is that the judgment of the Circuit Court of Appeals for the Seventh Circuit in No. 158

should be reversed and that of the Circuit Court of Appeals for the Ninth Circuit in No. 212 should be affirmed.

*No. 158, reversed.*

*No. 212, affirmed.*