John W. **BENNETT, Jr.** and Mary Bennett

v.

The **UNITED STATES.**

**No. 330–64.**

United States Court of Claims.

June 12, 1970.

Frederic W. Hickman, Chicago, Ill., for plaintiffs; Charles W. Davis, Chicago, Ill., attorney of record, Samuel H. Horne, Washington, D. C., Hopkins, Sutter, Owen, Mulroy, Wentz & Davis, Frederic L. Hahn, and Dennis B. Black, Chicago, Ill., of counsel.

Norman J. Hoffman, Jr., Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant, Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This tax suit was referred to Trial Commissioner George Willi with directions to prepare and file his opinion, findings, and recommended conclusion of law. The commissioner has done so in a report dated August 18, 1969, which recommends that the petition be dismissed. The taxpayer-plaintiffs have filed exceptions to the body of the opinion, to certain findings, and to the recommended conclusion. The Government has excepted to a part of the opinion and to the related findings, but is content with the recommended result. The case has been submitted to the judges on oral argument and briefs.

The court agrees fully with the trial commissioner's recommended conclusion of law, and also agrees with the reasoning of his opinion and with his findings, except (1) that the court does not pass, at this time, upon the trial commissioner's position (under Part I of his opinion, "The Allocation Issue") that Congress intended that no allocation made with respect to a distribution covered by Section 355 result in the corporation's earnings and profits exceeding its net worth (in the conventional sense), and also (2) that the court adds that the same end-result as Commissioner Willi reaches in Part I of his opinion, by considering the statute alone, can be reached by considering and applying the applicable regulation. We briefly discuss each of these points in the succeeding portions of this *per curiam* opinion.

*The "net worth limitation":* If we accept, as we do, the rest of the trial commissioner's reasoning on both the "allocation issue" and the "redemption issue", it is unnecessary to consider the question of the existence or content of the "net worth limitation" in this particular action seeking a tax refund for 1960 alone. However that specific issue might be decided, it could not affect the tax status of Canal's stockholders for that taxable year. The trial commissioner has found Canal's net worth immediately after the spin-off as $2,134,723, and also that, on the fair market value method of allocation together with the "net worth limitation", Canal's balance of post-1913 earnings and profits at January 1, 1961, was $454,172. This necessarily means that the 1960 distributions to Canal's stockholders were all attributable to post-1913 earnings and profits, and therefore taxable as ordinary income. If applicable at all, the "net worth limitation" would not and could not become operative until distributions made by Canal in later years. Accordingly, the court does not believe that, in this case, it should reach or decide the currently immaterial issue of the "net worth limitation", or intimate any view on that subject. We neither agree nor disagree with the trial commissioner's position on that point, but leave the question entirely open for future consideration if the issue should become pertinent or require decision. Since the result is the same as if the "net worth limitation" had no real effect, we simply assume *arguendo*, for the purposes of the case, that the "net worth limitation" governs as and in the form the trial commis-

sioner believed, and determine this case on that hypothetical assumption.*

*The regulation:* Commissioner Willi, in effect, decided the "allocation issue" without regard to section 1.312–10(a) of the Treasury Regulations. He preferred to look at the statute directly. Without suggesting in any way that he misconstrued or misapplied the statute, we point out that the regulation likewise supports the same reasoning and result as he obtains by direct reference to the Internal Revenue Code itself. As we understand Section 1.312–10(a), it spells out and tracks the statute, without adding much of substance except, perhaps, that it does indicate somewhat more clearly that in a "D" reorganization the fair market value method is *prima facie* to be applied unless there is reason to believe that the particular case is a "proper" one for the "net basis" method. In this instance, as the trial commissioner shows, taxpayers have not shown a "proper case" for the latter formula. They argue, however, that the regulation is invalid, presenting reasons why subpart (b) of the section is void as applied to non-"D" reorganizations. The answer, as the trial commissioner says, is that the two parts are separable, that only subpart (a) is involved here, and that that part is valid since it accords with and implements the statute.

As supplemented and qualified by the foregoing discussion, the court agrees with the trial commissioner's opinion, findings, and recommended conclusion (as hereinafter set forth), and hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiffs are not entitled to recover and their petition is dismissed.

---

* The defendant, which challenges the trial commissioner's position on the "net worth limitation", concedes that it is unnecessary for the court to decide that issue in this case in order to hold in the Government's favor.

## OPINION OF THE COMMISSIONER

WILLI, Commissioner:

Among the 5,700 shareholders of Canal-Randolph Corporation (hereinafter called "Canal") in 1960 were the plaintiffs, husband and wife, who owned 2,200 shares of Canal stock which at the time was publicly traded on the American Stock Exchange and later on the New York and London Exchanges.

On various dates in 1960 Canal made four quarterly distributions, totaling 42½ cents per share, on its outstanding stock. Plaintiffs' 2,200 shares thus yielded them a total of $935. On their 1960 joint federal income tax return they reported only $279.63 of the $935 as taxable income. They excluded the remaining $655.37 in the belief that it represented a return of capital to them and was therefore not taxable. The Revenue Service took the position that the entire $935 was a dividend and was accordingly taxable in full as ordinary income. Plaintiffs paid the resulting assessed deficiency and, after their timely claim for refund was formally disallowed, filed the instant suit.

Included among the items of gross income enumerated in section 61 of the Internal Revenue Code of 1954,[1] are "dividends." In turn, section 316 of the Code, in substance, defines a dividend as any distribution made by a corporation to the extent of its "earnings and profits," current and accumulated after February 28, 1913, at the close of the taxable year of the distribution. Section 316–1 of the Treasury Regulations explains the details of this Code provision.

The four 1960 Canal distributions in which plaintiffs participated totaled $581,397. Canal's current earnings and profits for 1960 amounted to $306,890.

---

1. All references herein to revenue *statutes* and Treasury Regulations are to the Internal Revenue Code of 1954 and regulations issued thereunder.

Plaintiffs, accordingly, concede that $493.54 of the $935 that they received is taxable to them as dividend income. That figure is the proportionate part of $935 represented by the ratio of $306,890 to $581,397. Whether the remainder of the $935 is also taxable to them as a dividend or is, as they say, a nontaxble return of capital, depends upon the amount of Canal's previously accumulated earnings and profits as of 1960. This is the issue on which the dispute in the case centers, and while its resolution requires a general tracing of Canal's origin and subsequent development through the year in suit, there are only two points in that corporate history at which the parties differ in their contentions as to the balance of earnings and profits—first, at the corporation's inception and, second, after it redeemed a portion of its outstanding stock in 1957.

Canal originated in 1955 as the offspring of Butler Brothers (hereinafter called "Butler"), a corporation that had successfully operated a general merchandise distribution business since the 1800's. The sales, warehousing and clerical aspects of this business required substantial building space which Butler periodically acquired both by purchase and lease at various places throughout the United States.

The increased operating efficiencies that resulted from a modernization program undertaken by Butler in 1950 made a good deal of floor space in various downtown-type buildings surplus to the needs of the business. When this occurred Butler sold some of such properties and held others for development. In 1955, after extended deliberation, Butler's board of directors concluded that the profit potential of the retained surplus properties could be more fully realized if they were divorced from the merchandising business and operated as a separate real estate venture. Among the properties that had been retained for development were two buildings in downtown Chicago, a 16-story building at Canal and Randolph Streets, and a 6-story building at Randolph and Water Streets, and a 17,400-square-foot lot used for surface parking in downtown Dallas. The 16-story building in Chicago was the most valuable of Butler's surplus properties. Though the building was 42 years old and had been used as a merchandise warehouse, its overall size and location near the Loop had caused Butler to initiate an extensive renovation program in 1953 for conversion of the entire building to commercial office space. While this project was not completed until 1961 at a total cost of over $5½ million, by the end of 1955 over $2 million had been expended and conversion had progressed to the point where annual rentals approached three-quarters of a million dollars. Moreover, firm projections, based on additional leases pending and imminently foreseeable, indicated an anticipated annual rental figure of more than $1⅓ million.

At the same time, both the 6-story loft building in Chicago and the parking lot in Dallas were producing significant rental revenues. More important, they had the attribute of strategic downtown location adapted to development into more profitable use.

In sum, when the Butler board was deliberating the matter of segregating the development properties from the basic business, the fair market value of the three properties mentioned above exceeded the value at which they were carried on Butler's books for tax purposes by approximately $5 million. The board was aware of this situation and was influenced by it in two respects. First, it was determined that prior to transfer of the properties, they should be encumbered to the extent of their respective book values and the loan proceeds retained by Butler as a means of reimbursing it for the extensive outlays that it had already made for conversion of the 16-story building to commercial office use. Second, and more important, the board was especially concerned that the transfer be handled in a manner that would not create a federal tax liability on the substantial gain that inhered in the properties. Accordingly, a consider-

able part of the study and attention directed to the overall question of transferring ownership of the properties was focused on the specific problem of selecting a method of accomplishing the transfer with the minimum federal tax bite.

After extended consultation with outsiders, and the resolution of some serious disagreement among its own members, the board finally settled on a plan known in tax parlance as a spin-off. The object was to form a new corporation and then transfer the properties to it in return for all of its stock so that it became Butler's wholly owned subsidiary.

Under Code Section 368(a) (1) (D)[2] such a transaction qualifies as a reorganization (hereinafter sometimes referred to as a "D" reorganization) in which, by virtue of section 361(a)[3] no gain is recognized as to Butler on its receipt of stock in exchange for the properties. In turn, Butler was to distribute the stock that it received to its shareholders on a pro rata basis in which case Code Section 355[4] provides that no gain or loss is to be recongnized by the Butler shareholders on their receipt of such stock.

The above plan was carried out with Canal as the newly formed real estate

2. The statute provides:
SEC. 368. Definitions Relating to Corporate Reorganizations.
(a) Reorganization.—
(1) In general.—For purposes of parts I and II and this part, the term "reorganization" means—
\* \* \* \* \*
(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

3. SEC. 361. Nonrecognition of Gain or Loss to Corporations.
(a) General Rule.—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

4. SEC. 355. *Distribution of Stock and Securities of a Controlled Corporation.*
(a) *Effect on Distributees.*—
(1) *General Rule.*—If—
(A) a corporation (referred to in this section as the "distributing corporation")—
(i) distributes to a shareholder, with respect to its stock, or
(ii) distributes to a security holder, in exchange for its securities, solely

stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,
(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),
(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and
(D) as part of the distribution, the distributing corporation distributes—
(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or
(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary or his delegate that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the advoidance of Federal income tax,
then no gain or loss shall be recognized to (and *no amount shall be includible* in the income of) such shareholder or security holder on the receipt of such stock or securities.

development corporation. After encumbering the three properties to the extent of $2¼ million and retaining the bulk of the loan proceeds, Butler exchanged the properties for Canal stock on December 31, 1955. Canal commenced business the following day. With the consummation of the stock-for-property exchange with Butler, Canal had an initial net worth, a preponderance of assets received (primarily the three properties) over liabilities assumed (the outstanding balance of the mortgage loan obtained by Butler), of $2,134,723. On March 15, 1956, the Butler shareholders received their pro rata distribution of Canal stock. Meanwhile Butler had applied for, and in due course obtained, a ruling from the Internal Revenue Service confirming, on the basis of the Code provisions previously mentioned, the nonrecognition of gain as to both Butler and its shareholders in respect to the reorganization and stock distribution that occurred. In a separate and somewhat later ruling the Service approved Butler's request that the basis of the Canal stock in the hands of the Butler shareholders be determined by apportioning, between Butler and Canal shares, their basis in Butler stock prior to distribution of the Canal stock in accordance with the relative fair market value of each of the two stocks immediately after the distribution. The parties are agreed on those fair market values with the result that 20.4593 percent of the predistribution basis of the Butler stock became the shareholders' basis for the Canal shares received by them.

In the present suit no one challenges any of the Revenue Service's ruling determinations described above. Thus, it is undisputed that the transaction creating Canal was a valid "D" reorganization and spin-off qualifying for both the shareholder and corporate nonrecognition privileges conferred by sections 355 and 361.

As earlier noted, the ultimate question in the case is the amount of Canal's earnings and profits in 1960, when the cash distributions totaling $935 were made to plaintiffs. The first disputed issue relevant to that question is the amount of Butler earnings and profits that must be allocated to Canal as a result of the reorganization and spin-off. The parties agree that some allocation is required. They have also been able to agree as to the total Butler earnings and profits available for allocation. Thus, it is stipulated that on December 31, 1955, Butler's earnings and profits totaled $20,391,798.75, $2,768,391.75 pertaining to the period prior to March 1, 1913, and the remainder, $17,623,407, to the period thereafter. Further, they have stipulated the net tax basis of the assets received by Canal (the adjusted basis of assets received less liabilities assumed) and the net tax basis of the assets retained by Butler immediately after the spin-off. As already noted, the fair market value of the publicly traded Butler and Canal stock immediately following the spin-off has also been agreed.

I

*The Allocation Issue*

Plaintiffs contend that Butler earnings and profits, both pre-1913 and post-1913, should be allocated between Butler and Canal in proportion to the relative value of the net tax basis of the two corporations' assets immediately after the spin-off. The Government urges that such earnings and profits should be allocated in accordance with the relative fair market value of the respective businesses following the spin-off. Plaintiffs' approach results in a far smaller balance of earnings and profits being attributed to Canal at its inception. Indeed, under plaintiffs' net tax basis method Canal's balance of accumulated earnings and profits would have amounted to no more than one-half its net worth and would have been exhausted well before 1960, when the distributions in issue were made.

The first essential in undertaking to select an appropriate method of allocating earnings and profits is an understanding of the character and composition of that which is to be allocated.

The term "earnings and profits" is singularly applicable to corporations, and more particularly to their shareholders, in the federal tax context. Thus, we are dealing with a tax, not an economic concept. Moreover, while the concept is associated with taxable corporations, its purpose and impact are altogether directed to the shareholders of such corporations. It is only when those persons receive corporate distributions in respect to the shares owned by them that the state of the distributing corporation's earnings and profits becomes pertinent. The inquiry into earnings and profits at that juncture is solely for the purpose of determining the shareholders' taxability on such distributions as they received, taxability being limited to the amount of the corporation's earnings and profits at the close of the year that the distributions were made. The amount of a profit corporation's earnings and profits never affects its income tax liability.[5]

■ Accordingly, an allocation of earnings and profits to a corporation born of a divisive reorganization, such as occurred here, is not an allocation of the old corporation's resources but an allocation of its tax attributes from the shareholder standpoint. Thus, a reorganization that involves no more than an existing corporation's transfer of some of its assets to a newly formed corporation in return for the latter's stock does not call for any allocation of the parent's earnings and profits to the subsidiary, the reason being that any future distributions by the new corporation must funnel through the old before getting into the hands of individual shareholders. The old corporation's balance of earnings and profits therefore remains the relevant litmus for testing shareholder taxability in the future. Mansfield v. United States, 141 Ct.Cl. 579, 159 F.Supp. 346,

cert. denied, 357 U.S. 920, 78 S.Ct. 1360, 2 L.Ed.2d 1364 (1958).

Although the conventional starting point in computing a corporation's earnings and profits is its earned surplus and taxable income, which ordinarily account for the bulk of the corporation's balance of earnings and profits, the terms are by no means necessarily synonymous. Certain items excluded from taxable income (e. g., tax-exempt interest and life insurance proceeds) are included in earnings and profits. Other items deducted in computing taxable income (e. g., dividends received, net operating loss, and capital loss carryover) are not deducted in computing earnings and profits. Still other items not deducted in computing taxable income (e. g., federal income taxes, excess charitable contributions, and expenses incurred earning tax-exempt interest) are deducted in computing earnings and profits. *See* Bittker and Eustice, *Federal Income Taxation of Corporations and Shareholders*, pp. 156–60 (1966).

In sum, the selection of a method of allocation must be approached with an awareness that we are dealing with a quantity that is strictly a shareholder-oriented attribute of a corporation. It is not a bankable item and is not a tangible ingredient of a corporation's financial structure in any relevant sense. The sole purpose for making the allocation in this case is an attempt to achieve a continuity of shareholder tax treatment as to future Canal distributions of cash or property, the aim being to impose the same tax characterization on such distributions as would have applied had Butler made them in the absence of a reorganization. Fundamentally, the object is simply to neutralize the effect of the divisive reorganization on future shareholder taxability.

---

5. Only when a corporation unreasonably accumulates the fruits of its earnings, rather than distributing them to its shareholders, does the amount of its earnings and profits become a factor in determining whether it is liable for the punitive tax that may be imposed in such situations. See secs. 531–537. Since liability for this special tax depends solely on the corporation's shareholder distribution performance, it is noteworthy that even in this corporate tax context the matter of earnings and profits retains its shareholder-oriented character.

The 1954 Code contains no express formula for the allocation of earnings and profits in a spin-off transaction such as occurred here. Instead, under the impetus of the Senate, Congress charged the Treasury Department with the responsibility of issuing definitive regulations adapted to achievement of a "proper allocation" in the context of the particular situation presented. Thus, section 312(i) provides, in pertinent part:

> In the case of a distribution or exchange to which section 355 * * * applies, proper allocation with respect to the earnings and profits of the distributing corporation and the controlled corporation * * * shall be made under regulations prescribed by the Secretary or his delegate.

With plaintiff contending for a net tax basis method of allocation, it is worth noting that the above treatment, having flexibility as its watchword, was adopted in preference to a House-passed provision that detailed the allocation process and did so in terms of net tax basis.[6] The implication of this action is that there is no such thing as an "all-purpose" method of allocation—certainly not one based on net tax basis.

Section 312(i) originated with the Senate Finance Committee. Insofar as pertinent to the issue here, the Committee explained its action as follows (S.Rep. No.1622 83d Cong., 2d Sess. 250; 3 U.S. CODE CONG. & AD. NEWS (1954) pp. 4621, 4887–4888):

> Subsection (i) of section 312 replaces section 310(c) of the House bill. The House bill provides detailed rules for allocating earnings and profits where there is a corporate separation. Your committee provides that the allocation in such cases shall be made under regulations. Thus, *in a distribution or exchange to which section 355 applies* (or so much of sec. 356 as relates to sec. 355), *it is intended that the Secretary (or his delegate) shall have the power to provide for proper allocation* of the earnings and profits of the distributing corporation to the controlled corporation (or corporations). *As a result of such allocation, in no case may the earnings and profits of a corporation exceed its total net worth.* [Emphasis added.]

> *In a distribution or exchange to which section 355 applies and which is pursuant to a reorganization as defined under section 368(a) (1) (D)* (and takes place immediately after the corporate transfer of assets) *the principle of the Sansome case (Commissioner of Internal Revenue v. Sansome, 60 F.2d 931, C.A.2d (1932), cert. den., Sansome v. Burnet, 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575 will be applied to allocate a portion of the earnings and profits of the distributing corporation to the controlled corporation.* However, no deficit of a distributing corporation will ever be allocated to a controlled corporation. [Emphasis added.]

The Finance Committee's remarks reveal that while it was intended that the Commissioner of Internal Revenue (as the Secretary's delegate) exercise broad discretion in prescribing the

---

6. Sec. 310(c) of H.R. 8300, 83d Cong., 2d Sess. (1954) provided as follows:

 Upon the distribution by a corporation of securities or property * * * in a corporate separation * * * its earnings and profits shall be decreased by an amount which bears the same relation to the earnings and profits immediately prior to the transaction as the amount of money and the adjusted basis of the assets (plus the principal amount of securities, if any) distributed bears to the amount of money and the adjusted basis of the total assets immediately prior to such distribution. * * * For the purpose of this subsection, the adjusted basis of the total assets of the corporation shall be reduced by the principal amount of its liabilities immediately prior to the distribution and the adjusted basis of the assets distributed shall be reduced by the amount of the liabilities to which such assets are subject.

 For the Ways and Means Committee's explanation of section 310(c) of the House bill, see H.Rep.No. 1337, 83d Cong., 2d Sess. (3 U.S.Code Cong. & Ad.News (1954), pp. 4017, 4233).

detailed means for achieving a "proper allocation," he was specifically admonished to fashion his prescription within clearly stated guidelines. First, he was told that any allocation made in respect to a distribution covered by section 355, as here, could in no event result in a corporation's earnings and profits exceeding its total net worth. Significantly, in section 312(i), *supra,* the Commissioner's rule-making authority in the allocation area was specifically defined by the same criterion, *i. e.,* a distribution to which section 355 was applicable. It is therefore clear that Congress intended that the net worth limitation apply to any allocation made by the Commissioner pursuant to his regulations. Second, the Commissioner was told that where, as here, a distribution covered by section 355 occurred in connection with a "D" reorganization, the allocation must be made in consonance with the principle of the *Sansome* case. (Commissioner of Internal Revenue v. Sansome, 60 F.2d 931 (2d Cir. 1932), cert. denied, 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575.)

The Commissioner responded to Congress' mandate with section 1.312–10(a) of the Treasury Regulations. As to a "D" reorganization such as here involved, the regulation provides:

> In the case of a newly created controlled corporation, *such allocation generally shall be made in proportion to the fair market value of the business or businesses* (and interests in any other properties) retained by the distributing corporation and the business or businesses, (and interests in any other properties) of the controlled corporation immediately after the transaction. In a proper case, allocation shall be made between the distributing corporation and the controlled corporation in proportion to the net basis of the assets transferred and of the assets retained or by such other method as may be appropriate under the facts and circumstances of the case. The term "net basis" means the basis of the assets less liabilities assumed or

liabilities to which such assets are subject. [Emphasis added.]

It is seen that while the regulation certifies the fair market value approach as the general rule, the ultimate standard for selection of an appropriate method is left to depend on the particular "facts and circumstances" of the subject transaction.

In the present case the Commissioner applied the fair market value method of allocation. The respective value of the Butler and Canal businesses for this purpose is determined on the basis of the quoted value of the outstanding stock of each of the companies. Since at the time of the spin-off the stock value of both Butler and Canal was established by arm's length trading on public exchanges, a fact to which the parties have stipulated it would be inappropriate to approach valuation of the overall businesses from the standpoint of individual underlying corporate assets.

As earlier noted, Butler's accumulated earnings and profits, both pre-1913 and post-1913, aggregated $20,391,798.75 at the time of the spin-off. An allocation based strictly on relative value of the businesses, as reflected by total market value of their respective stock, and without the imposition of any net worth limitation, attributes $4,180,319 to Canal as its opening balance of pre-1913 and post-1913 earnings and profits in the same relative proportion as existed with respect to Butler.

Because the portion of the Commissioner's regulation dealing with allocations incident to "D" reorganizations expressly hedges endorsement of every allocation method in terms of the unforeseeable and therefore unspecified factual particulars of each subject transaction, the mere fact that the regulation notes a general preference for the fair market value method creates no presumption that it is right for this case. Whether it passes muster here must be judged by the extent to which the result that it produces satisfies the end-result ground rules announced by Congress itself. As

it is drawn, the regulation is essentially *pro forma* in character—neither adding to, detracting from, nor even undertaking to explain, the two generally applicable requirements that Congress has made known.

As previously noted, the first of the two rules reflected by the legislative history is in the form of an absolute limitation on the consequence of an allocation rather than a means for selecting an appropriate method for making the allocation. Thus, we are advised that no matter how great the conceptual and practical merit of an allocation made in a given case, the resulting apportionment of earnings and profits to any corporation must be limited to the amount of its net worth. Although defendant faintly suggests otherwise,[7] it is evident that for purposes of the limitation Congress envisioned net worth in its conventional and generally understood balance sheet sense; not the hybrid net worth, based on market value rather than book value of assets, that has been infrequently employed and, when employed, specifically defined. See section 341(e) (7).

Canal's net worth immediately after the spin-off was $2,134,723. That figure therefore represents the ceiling that must be imposed on the $4,180,319 of Butler earnings and profits allocable to Canal in the first instance purely on the basis of relative fair market value of the respective businesses. In turn, the scaled-down total of $2,134,723 must be apportioned as between pre-1913 and post-1913 balances in the same percentage relationship that those two components bore to each other in the hands of Butler. With the net worth limitation thus superimposed, the fair market value method of allocation leaves Canal with an opening balance of earnings and profits totaling $2,134,723, $289,810 of which is attributable to the pre-1913 period and $1,844,913 to the period thereafter. It is this end result, by which approximately 10 percent of Butler's

accumulated earnings and profits are imputed to Canal, that must survive plaintiffs' challenge if the Government is to prevail on the issue of allocation.

Unlike the directive involving the overriding net worth limitation, the second allocation standard supplied by Congress goes to the issue of selecting a suitable method. To be appropriate, the Finance Committee said, the allocation must implement the principle of the *Sansome* case. That principle is not in doubt; nor was it when the Committee spoke.

In *Sansome,* the old corporation, pursuant to a reorganization transferred all of its assets to a new corporation which assumed all of its liabilities. The new corporation issued its stock to the stockholders of the old corporation on a pro rata basis. At the time of the reorganization the old corporation carried on its books a large balance of surplus and undivided profits. The new corporation made no profits during the next two years, whereupon it made distributions in liquidation to its stockholders. As a basis for its holding that such distributions were taxable dividends, the court said 60 F.2d at page 933:

> * * * What were "earnings or profits" of the original * * * company remain, for purposes of distribution, "earnings or profits" of the successor * * * in liquidation. * * *

Although the *Sansome* opinion was cast in terms of continuity of business enterprise and shareholder interest, it has since been firmly established that the rationale of the decision was the prevention of tax avoidance at the shareholder level. The justification for the *Sansome* line of cases has generally been ascribed to the fertile area for the improper minimization of earnings and profits afforded by reorganization transactions. Thus, in Commissioner of Internal Revenue v. Munter, 331 U.S. 210, 67 S.Ct. 1175, 91 L.Ed. 1441 (1947), the

---

7. Defendant stops short of even requesting a finding of fact as to Canal's net worth in terms of market, rather than book values.

Supreme Court stated at pages 214–215, 67 S.Ct. at page 1177:

> A basic principle of the income tax laws has long been that corporate earnings and profits should be taxed when they are distributed to the stockholders who own the distributing corporation. * * * Thus unless those earnings and profits accumulated by the predecessor corporations and undistributed in this reorganization are deemed to have been acquired by the successor corporation and taxable upon distribution by it, they would escape the taxation which Congress intended. * *
>
> * * * * * *
>
> The congressional purpose to tax all stockholders who receive distributions of corporate earnings and profits cannot be frustrated by any reorganization which leaves earnings and profits undistributed in whole or in part.

Two years later, in Commissioner of Internal Revenue v. Phipps, 336 U.S. 410, 69 S.Ct. 616, 93 L.Ed. 771 (1949), the Supreme Court similarly remarked at pages 417, 420, 69 S.Ct. at page 620:

> * * * the *Sansome* rule is grounded not on a theory of continuity of the corporate enterprise but on the necessity to prevent escape of earnings and profits from taxation.
>
> * * * * * *
>
> * * * the effect of the *Sansome* rule is simply this: a distribution of assets that would have been taxable as dividends absent the reorganization * * * does not lose that character by virtue of the tax-free transaction.

The Supreme Court's tax avoidance rationale of *Sansome* has been acknowledged and reaffirmed in subsequent litigation. United States v. El Pomar Investment Co., 330 F.2d 872, 882–883 (10th Cir. 1964); McCullough v. United States, 170 Ct.Cl. 1, 7 n. 12, 344 F.2d 383, 387 n. 12 (1965); Dunning v. United States, 353 F.2d 940, 944 (8th Cir. 1965), cert. denied, 384 U.S. 986, 86 S.Ct. 1886, 16 L.Ed.2d 1003 (1966). *See also* Rice, *Transfers of Earnings and Deficits in Tax-Free Reorganizations: The San-some-Phipps Rule,* 5 Tax L.Rev. 523 (1950); Note, *Corporate Reorganizations and Continuity of Earnings History; Some Tax Aspects,* 65 Harv.L. Rev. 649 (1952).

Once it is recognized that the guiding principle of *Sansome* is that the continuity of shareholder taxability is not to be obliterated by the intervention of a tax-free reorganization, the general suitability, *under the facts of this case,* of the fair market value allocation method used by the Revenue Service becomes apparent.

The facts are such that in terms of end result the fair market value method effectuates the *Sansome* principle ordained by Congress while the net tax basis method urged by plaintiffs does quite the opposite.

The parties agree that had Butler in the absence of the reorganization creating Canal, made the 1960 distributions in suit they would have been fully covered by post-1913 accumulated earnings and profits and would, therefore, have been taxable in their entirety as ordinary dividends. Whereas the fair market value method imputes to Canal a sufficient portion of Butler's earnings and profits to preserve the same end result, the plaintiffs' net tax basis approach attributes so little of Butler's earnings and profits to Canal (about 5 percent) as to leave the latter with none by 1960 and therefore does precisely what *Sansome* condemned—permits a tax-free reorganization to convert the character of the 1960 distributions (except to the extent of Canal's current earnings and profits for that year) from a dividend to a return of capital.

Though the *Sansome* end-result test of equivalence in old vs. new shareholder taxability may not always be dispositive in selecting an allocation method, a method that completely fails that test cannot, in the absence of compelling countervailing circumstances, displace one that meets it. Nothing of that order is present here.

The issue to be decided is not whether the allocation method employed by the Service is perfect but whether, with the guideline principles of the legislative history as the standard for comparison, it is on balance preferable, under the facts involved, to the method proposed in its stead. Not only are plaintiffs' asserted flaws in the fair market value method insufficient to warrant its rejection, but the shortcomings of the net tax basis approach, as applied to the facts of the case, are so severe as to make that method an unacceptable substitute in any event.

The several flaws that plaintiffs perceive in the fair market value method are summarized below.

Plaintiffs focus principally on the Commissioner's allocation regulation, section 1.312–10. In format, the regulation is drafted in three subparagraphs. Subparagraph (a), previously quoted herein, deals solely and expressly with spin-offs incident to "D" reorganizations, the case at hand. Subparagraph (b) deals exclusively with spin-offs in pursuance of non-"D" reorganizations, not this case. Subparagraph (c) concerns allocation of deficits, an issue not present here.

It is true, as plaintiffs say, that subparagraph (a), under which the present allocation was made, is silent as to the net worth limitation mandated by the legislative history. The suggestion that because of this omission the entire provision should be wiped out is neither warranted nor availing to the plaintiffs. As already noted, the gist of this portion of the regulation is not substantive in character. It really says nothing more than that if a spin-off occurs in conjunction with a "D" reorganization an allocation will be made and will be made in whatever manner is appropriate under the facts of the particular transaction. If the presently challenged allocation had been made under some detailed formula authorized by the regulation that was shown to run counter in some material respect to the law as enacted, the question of validity would assume real conse-

quence. This is not our case, however. As it is drawn, the relevant portion of the regulation supplies little if anything more than a bare warrant for the Commissioner to make some sort of allocation in accordance with his instructions from Congress. The only consequence of invalidation of the provision would seem to be that plaintiffs could then argue that no allocation should have been made. This is not their position, however. Their quarrel is with the style of the allocation, not with the fact that one was made. With the regulation as it is, the contested issue must be decided by the law as illuminated by the legislative history. By those lights, the net worth limitation must be applied and this has been done.

 Plaintiffs' second argument, with invalidation of the regulation also as its goal, is an elaborate showing that subparagraph (b), inapplicable to this case, overtly offends manifest congressional intent and therefore must fall, bringing down subparagraph (a) with it. The short answer to this is that in substantive terms subparagraph (a) is in no way dependent on subparagraph (b), though the reverse may not be true. More important, even if plaintiffs were to prevail on this point, their cause would not be advanced since they do not contend that no allocation should have been made.

Having centered their fire on the asserted invalidity of section 1.312–10(a) of the Regulations, plaintiffs next urge that it affirmatively endorses use of their net tax basis approach for this case as the "proper" method of allocation because Canal's net worth was significantly less than the amount of Butler earnings and profits allocable to it strictly on the basis of relative fair market value of the two businesses. The crux of the argument requires the assmuption that in speaking of net worth, the Finance Committee was announcing a test for acceptability of various allocation methods, not a limitation on the results that could permissiby flow from use of those methods. As plaintiffs would have it, any method

that attributed earnings and profits to a corporation in an amount greater than its net worth would be peremptorily scrapped. Aside from the fact that plaintiffs' theory finds no support in the plain language used by the Finance Committee in referring to net worth, it is untenable in any event as applied to an allocation made in respect to a "D" reorganization. For such an allocation, the Committee unqualifiedly directed that " * * * the principle of the *Sansome* case will be applied * * *." Not only does a corporation's net worth form no part of that principle, but to credit plaintiffs' claim it must be assumed that, contrary to the clear purport of its words, the Committee really meant that an allocation incident to a "D" reorganization was only to be governed by the *Sansome* principle if it did not attribute earnings and profits to a corporation in an amount greater than its net worth. It cannot be reasonably assumed that Congress was so inarticulate. The more rational view, and that applied here, is that net worth was intended to function as a general relief measure in the nature of a cutoff point—a point beyond which no allocation could go no matter how appealing and well-grounded in its own right. It is also worth noting that on the facts of this case the practical effect of plaintiffs' proposition would be to discard the fair market value method, though it demonstrably attains the *Sansome* principle because it pierces Canal's net worth ceiling, and replace it with the net tax basis method which gives no accommodation to *Sansome* and imputes earnings and profits to Canal amounting to only one-half of its net worth. So bizarre a result should not be sanctioned in the absence of compelling circumstances not present here.

Next, plaintiffs contend that the symmetry of Canal's balance sheet, as a matter of accounting format, will be destroyed if the amount of earnings and profits flowing from the fair market value method is attributed to it. The short answer to this, as explained at the outset, is that the earnings and profits figure is not an ingredient of a corporation's balance sheet structure. Earnings and profits are neither a corporate resource nor liability. Since, aside from corporate accumulation penalties, the earnings and profits account functions solely as a check valve on the taxable character of shareholder distributions, a balance sheet entry pertaining to it would properly be in the nature of an annotation for stockholder information purposes, not a part of the accounting portrayal of the corporation's own financial condition.

Plaintiffs' final criticism of the fair market value allocation method is their most valid one, albeit that the problem they perceive is at best potential rather than actual. Their point is that since the fair market value of the Canal business reflects the appreciation in value of the properties acquired from Butler at book value in the tax-free reorganization, a portion of the earnings and profits imputed to Canal under the Commissioner's method is attributable to that appreciation. Should Canal someday sell these properties for more than the book values at which it acquired them, additional earnings and profits will be generated by the gain. To the extent that the gain ultimately realized parallels the market value appreciation in the properties when Canal received them, it might be said that a double dose of earnings and profits would result from only a single taxable event involving the same properties. Though taken in the abstract, the argument has conceptual appeal; it loses lustre on analysis.

First, the uncontroverted evidence shows that Canal was formed for the purpose of developing the properties transferred to it, not to dispose of them. It will be recalled that what Canal got was the distillate of Butler's surplus property holdings. Butler had previously called the properties earmarked for sale. There is no reason to assume that the basic plan of long-term development on which Canal was founded would be reversed in the foreseeable future. Also militating against an early disposition of

the original Canal properties was the post spin-off "active business" requirement of section 355(b) (1) (A). Moreover, a profitable sale of the properties would not necessarily generate earnings and profits. If there were a sale under section 337 or a distribution in kind under section 311(a) (2), no gain or loss would be recognized by Canal and, by virtue of section 312(f) (1), its earnings and profits would be unaffected.

Finally, imposition of the net worth limitation approximately halved the amount of earnings and profits attributable to Canal solely on the basis of the relative fair market values of the Canal and Butler businesses. Consequently, the impact of the theoretically possible compounding of earnings and profits envisioned by plaintiffs has been drastically reduced, if not eliminated.

For the above reasons, the conceptual chink that plaintiffs have fastened on the fair market value method as applied to appreciated property falls far short of warranting the method's wholesale rejection for this case.

As earlier stated, the question is not whether the Commissioner's method is perfect but whether its detractors can offer anything better in terms of fulfillment of discernible congressional purpose.

Even if plaintiffs had been able to more effectively discredit the approach applied by the Revenue Service, it is most doubtful that a substitution of the net tax basis method could have responsibly been deemed acceptable for use in this case. The principle of *Sansome* was the cardinal allocation rule prescribed by Congress for use in "D" reorganizations. The results yielded by plaintiffs' method run squarely counter to that bellwether principle and, in the bargain, leave Canal with earnings and profits of scarcely 50 percent of its net worth. Only on a showing of transcendent extrinsic cir-

cumstances,[8] clearly not present here, could those results become tolerable.

In summary, by reason of the "D" reorganization and spin-off, $289,810 of Butler's pre-1913 earnings and profits and $1,844,913 of its post-1913 earnings and profits are allocable to Canal.

II

*The Redemption Issue*

■ The remaining area of dispute affecting Canal's balance of earnings and profits in 1960, and therefore the taxability of the four distributions to plaintiffs in that year, involves the effect of Canal's 1957 redemption of 165,000 shares (15.25494 percent) of its own stock for $1,196,250 in cash. The question is the extent to which that 1957 payment absorbs Canal's post-1913 earnings and profits thereby diminishing the balance thereof for subsequent years, including 1960, the year in suit.

It should be noted that the real parties in interest as to Canal's characterization of its redemption payment are not those who received the payment upon surrender of their shares but the surviving shareholders who would receive future distributions from Canal. Compliance with the requirements of section 302, unquestioned here, assured those who received the distribution in redemption of the same favorable tax treatment, whether the distribution is deemed to have been made out of Canal's capital account or out of its post-1913 earnings and profits.

Sections 312(a) and 312(e) are the relevant provisions of the Internal Revenue Code.

As to the effects of distributions generally on the distributing corporation's earnings and profits, section 312(a) provides:

* * * on the distribution of property by a corporation with respect to

---

8. An example might be where the evidence reflects the specific portion of the old corporation's earnings and profits actually generated by the assets transferred to the new. Here, the parties agree that this cannot be done.

its stock, the earnings and profits of the corporation (to the extent thereof) shall be decreased by the sum of

(1) the amount of money,

\* \* \* \* \* \*

so distributed.

In the particular case of distributions in redemption, as occurred here, the general rule is qualified by section 312(e), as follows:

\* \* \* in a redemption to which section 302(a) \* \* \* applies, the part of such distribution which is properly chargeable to capital account shall not be treated as a distribution of earnings and profits.

The net of the above provisions is that so much of Canal's $1,196,250 redemption payment as is not "properly chargeable to [its] capital account" will be deemed a distribution out of its post-1913 earnings and profits. The Code provides no formula or detailed instructions for implementing the stated objective.

Though the parties differ as to whether the "capital account" referred to in section 312(e) includes a corporation's pre-1913 earnings and profits, plaintiffs saying "yes" and defendant "no" they agree that the portion of a redemption payment to be charged to that account, once defined, has been settled by William D. P. Jarvis, 43 B.T.A. 439 (1941), aff'd, 123 F.2d 742 (4th Cir. 1941). Under *Jarvis*, the amount chargeable to the capital account is that portion of the account equal to the percentage of the corporation's total outstanding shares represented by the number of shares redeemed, here an agreed 15.25494 percent.

At its inception, Canal's capital account totaled $2,134,723, represented by the preponderance of book value of assets received from Butler over liabilities assumed. Applying the *Jarvis* rule, $325,651 (15.25494 percent of $2,134,723) of the $1,196,250 redemption payment is chargeable against capital.

The parties' difference centers on the effect to be given the Butler pre-1913 earnings and profits, found earlier herein to be $289,810, allocated to Canal as a result of the "D" reorganization and spin-off. Noting that the Supreme Court long-ago held that in determining the taxability of distributions to shareholders, pre-1913 earnings and profits are treated as capital,[9] plaintiffs contend that only 15.25494% of Canal's pre-1913 earnings and profits should be deemed a part of the redemption payment, leaving the remainder of that payment (aside from the $325,651 discussed above) to be charged against post-1913 earnings and profits, both current and accumulated. Defendant, on the other hand, urges that in a redemption situation, pre-1913 earnings and profits are to be fully exhausted before any charge is made to post-1913 earnings and profits. Defendant is correct in its contention that the Supreme Court has so held. Moreover, that holding is expressly recognized in the *Jarvis* case on which plaintiffs rely for a contrary result.

In Foster v. United States, 303 U.S. 118, 58 S.Ct. 424, 82 L.Ed. 700 (1938), a corporation with pre-1913 earnings and profits of at least $3,630,000 redeemed 25 percent (500 shares) of its stock for cash in the amount of $1,025,000. In deciding that the redemption price was chargeable in its entirety to the capital account, with no reduction of post-1913 earnings and profits, the Supreme Court said at page 122, 58 S.Ct. at 426:

\* \* \* Congress obviously intended that corporate funds distributed under the circumstances here shown should be "chargeable to capital account" and that stock purchases of the type here involved should not be considered "for the purpose of determining the taxability of subsequent distributions by the corporation."

\* \* \* \* \* \*

The $1,025,000, paid for the company's stock, cannot, therefore, be considered "for the purpose of determining the taxability of subsequent dis-

9. Southern Pacific Co. v. Lowe, 247 U.S. 330, 335, 38 S.Ct. 540, 62 L.Ed. 1142 (1918); Helvering v. Canfield, 291 U.S. 163, 54 S.Ct. 368, 78 L.Ed. 706 (1934).

tributions by the corporation" and this purchase of stock did not exhaust any part of the $330,578.98 profits accumulated since 1913. * * *

In *Jarvis, supra,* decided shortly thereafter, a corporation redeemed 10 percent of its stock for cash in the amount of $1,160,000. It was decided that the amount of the distribution in redemption properly chargeable to the capital account is that portion of the account equal to the percentage of shares redeemed. Thus, the $1,160,000 redemption payment was chargeable to capital in the amount of $100,000 (*i.e.,* 10 percent thereof) and paid-in surplus in the approximate amount of $90,000 (*i.e.,* 10 percent thereof), with the balance of almost $970,000 chargeable to post-1913 earnings and profits.

Both the Board of Tax Appeals and the Court of Appeals emphasized that their holdings were consistent with *Foster* because, unlike *Foster,* no pre-1913 earnings and profits were involved.

Thus, the Board said (43 B.T.A. at 444):

* * * the facts are exactly comparable with those in Foster v. United States, 303 U.S. 118, 58 S.Ct. 424, 82 L.Ed. 700, except that here the existence of the corporation, and hence of its accumulated earnings, began in 1915, and the date of March 1, 1913, has no relevance. * * *

' * * * the difference is crucial. The 1913 date lay at every point in the Court's consideration of the *Foster* case. It permeates the entire reasoning of the opinion, and therefore the decision must be limited to cases involving pre-1913 earnings. It was said that the prior stock purchase was properly chargeable to capital account consisting of pre-1913 earnings and left post-1913 earnings unimpaired and available for distribution as a dividend in the later year. A tax on such a dividend was what Congress plainly intended to impose and it was

not to be defeated by the bookkeeping device of charging it to pre-1913 earnings, which by earlier judicial decision had been held to be nontaxable capital. *Cf.* Helvering v. Canfield, 291 U.S. 163, 54 S.Ct. 368, 78 L.Ed. 706.

Similarly, in affirming the Board, the Court of Appeals noted (123 F.2d at 746):

* * * The Foster case dealt with pre-1913 earnings. Here the Acheson Corporation began its existence in 1915 and began to accumulate earnings from that date. The Foster case is clearly limited, as is shown by a study of the opinion there, to transactions involving those occurring before 1913 and in that respect is clearly distinguishable from the instant case and is, therefore, not controlling.

The Foster case prevented an escape from taxation by the stockholder of earnings made after 1913. * * *

Although commentators have questioned the conceptual soundness of the unlimited charge to pre-1913 earnings and profits, they recognize that such is the clear, and still controlling holding of *Foster.* See Edelstein & Korbel, *The Impact of Redemption and Liquidation Distributions on Earnings and Profits: Tax Accounting Aberrations Under Section 312(e),* 20 Tax.L.Rev. 479, 494 (1965).

Applying the rules of *Foster* and *Jarvis* to the facts here involved, the $1,196,250 redemption payment is chargeable as follows: $325,651 to capital a c c o u n t; $289,810 to pre-1913 earnings and profits; $165,664 to current earnings and profits; and $415,125 to post-1913 accumulated earnings and profits.

As a result of the determinations made herein with respect to the allocation and redemption issues, Canal's balance of post-1913 earnings and profits is found to be $454,172 at January 1, 1961. The full amount of the 1960 distributions to plaintiffs was therefore taxable to them as ordinary income.